The STATE of Ohio, Appellee,

v.

TAYLOR, Appellant.

[Cite as *State v. Taylor* (2000), 138 Ohio App.3d 139.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 99 CA 23.

Decided June 16, 2000.

*Anthony E. Kendall,* Miami County Assistant Prosecuting Attorney, for appellee.

*Jon Paul Rion,* for appellant.

FREDERICK N. YOUNG, Judge.

Stephan R. Taylor is appealing his conviction on one count of drug abuse in violation of R.C. 2925.11(A) and (C)(4)(a) on grounds that his detention following a routine traffic stop of the car in which he was a passenger was unreasonable

and therefore illegal. In his sole assignment of error, Taylor claims that the trial court erred in denying his motion to suppress evidence obtained as a result of his improper detention.

The following facts were related to the trial court by Trooper Chris Coverstone of the Ohio Highway Patrol during the suppression hearing held on Taylor's motion. Coverstone was the only witness called by the state, and the defense called none. Coverstone testified that on May 6, 1998, at approximately 12:34 a.m., he was positioned at mile marker 78 on Interstate Highway 75 for the purpose of checking motorists' speeds with his laser instrument. At that time, he determined that a northbound Lexus automobile with Michigan plates was going seventy-two miles per hour where the posted limit is sixty-five. As he pursued the Lexus, he ran a check on its license plate to see if the car had been reported stolen; it was not, and he learned the car was registered to Glenda Jackson. Coverstone effected a traffic stop just north of Highway 36 in Piqua, Ohio.

Coverstone approached the car and asked the driver for his license and the car registration. He noticed that the car was littered with trash and strongly smelled of air freshener. As the three male occupants searched for the car registration, the glove box was opened, and Coverstone saw a bottle of air freshener in the compartment. In response to Coverstone's questioning about their destination, both the driver, Jesse Owens, and the front seat passenger, appellant herein Stephan Taylor, responded that they were headed for Detroit. The registration was nowhere to be found in the car, but the occupants explained that Glenda Jackson was Taylor's wife and that they had her permission to drive the car. Coverstone radioed in to dispatch and asked that someone there call Jackson to confirm what Taylor and Owens had said, and at 1:09 a.m., dispatch reported back to Coverstone that the men were using Jackson's car with her permission.

Meanwhile, intending to cite Owens for speeding, Coverstone asked that he accompany him back to the patrol car, which Owens did. Coverstone noticed Owens became increasingly nervous after getting out of the Lexus, and that he had even begun to sweat even though the night was cool. In addition, Coverstone detected the odor of alcohol about Owens. After performing the horizontal gaze nystagmus and a breath alcohol tests, however, Coverstone determined that Owens was not illegally impaired. Nevertheless, he placed Owens in the back seat of his cruiser, and went about checking Owens' Michigan driver's license in preparation for completing a citation for speeding. The report on Owens' license, however, showed that it had been suspended. Coverstone placed Owens under arrest for driving while under suspension and conducted a pat-down search of

Owens incident to his arrest, finding two grams of marijuana[1] in one of his pockets.

At about that time, backup arrived on the scene and checks were run on the passengers' driver's licenses, not for their validity, but to see if either had any warrants outstanding, which neither did. Because Owens had displayed signs of nervousness and had been carrying marijuana in his pocket, Coverstone then requested criminal histories on all three men. The dispatcher reported back that Owens and Taylor had previous convictions for aggravated trafficking. Upon learning this, Coverstone requested that a canine unit be sent to the scene so the car could be checked for narcotics. Taylor and the other passenger were taken out of the Lexus, placed in "protective custody" in the back seats of the patrol cars, and advised that they were not under arrest. In the process, Coverstone noticed two bulges in Taylor's pockets, and, when asked about them, Taylor answered that he had $1,500 cash in his pockets for traveling money.

The canine unit arrived at the scene at 1:52 a.m., having traveled from Eaton in Preble County, Ohio, east through Montgomery County, then north to Piqua, Ohio, which is not far from the northern boundary of Miami County. At about that same time, Taylor and the other passenger were placed in the patrol cars. After Bilko the drug-sniffing dog alerted to the rear of the car, Coverstone began a search of the car by opening the trunk. Inside, he saw what he believed to be marijuana seeds on the carpet, a box of fabric softener sheets, and an uncertain number of the softener sheets spread out in the trunk. When he pulled back the carpeting in the trunk, Coverstone saw numerous bundles of cash later determined to be $16,300, most of which was made up of twenty-dollar bills. He immediately discontinued the search and advised his supervisor of what he had found.

Soon thereafter, Taylor, Owens, and the third man were read their *Miranda* rights and told again that they were being held in protective custody. All three indicated an understanding of their rights as explained to them, and none was handcuffed at that time. When Coverstone questioned Taylor about the cash in the car, Taylor provided the unlikely explanation that the money must have been in the trunk when he and his wife purchased the car.

After a tow truck was called to the scene, the vehicle was taken to the Piqua Patrol Post, and Taylor and the others were taken to the post in patrol cars. From 2:47 a.m. until 3:30 a.m., the car was thoroughly searched and photographed. No additional cash or drugs were found in the vehicle. The $16,300

---

1. Under R.C. 2925.11(C)(3)(a), possession of any amount of marijuana less than one hundred grams is a minor misdemeanor and is consequently not an offense for which, in and of itself, Owens could have been arrested. R.C. 2935.26(A).

found in the trunk and the $1,555 found in Taylor's pockets were hidden in the post garage and the drug-sniffing dog located the money and alerted again. Later, Coverstone began questioning Taylor and noticed a small packet of what proved to be cocaine lying by Taylor's foot. As with the cash found in the car trunk, Taylor denied any knowledge of how the packet came to be in such close proximity to him. Nevertheless, he was arrested and charged with one count of possession of cocaine, or "drug abuse" as stated in the indictment, in violation of R.C. 2925.11(A) and (C)(4)(a).

On March 17, 1999, Taylor filed a motion to suppress the evidence against him on the basis that his seizure at the hands of the troopers was without probable cause or a warrant, and was therefore illegal. A hearing on the motion was held on March 23, 1999. The trial court analogized the finding of drugs on one occupant of a vehicle to the "plain smell" exception to the fourth Amendment's warrant requirement, and held Taylor's detention was legal, reasoning that when one occupant of an automobile is found to be in possession of drugs, officers are justified in detaining other occupants for further investigation and in searching the entire vehicle. Taylor entered a no contest plea on March 25, 1999, was found guilty by the trial court, and was sentenced to an eleven-month term of incarceration, suspension of his driver's license for two years, and payment of costs. His timely appeal followed.

Taylor's sole assignment of error is set forth as follows:

"It was 'unreasonable,' within the meaning of the Fourth Amendment, for the officer to detain Appellant after the driver was arrested, when the officer: knew that Appellant had a valid driver's license, knew he had permission to drive the car, and when the indicia of drug transportation was minimal."

Taylor argues that he should have been permitted to continue on his way in his wife's vehicle after Owens was arrested for driving under suspension. He claims that at the time of Owens' arrest, the troopers knew that he had a valid driver's license and that he was in possession of his wife's car with her permission. His argument misstates the facts, however.

A meticulous review of the record shows that Taylor and the other passenger were not asked for identification until after Owens' arrest and search. Thus, it is not clear that the troopers knew whether Taylor was validly licensed, although they had been informed by dispatch that he was in lawful possession of the vehicle by that time. The only question left for us to answer, therefore, is whether the troopers were justified in detaining Taylor from the time Owens was arrested to the time the narcotics-detecting dog arrived on the scene and alerted to the rear of the automobile. The state does not dispute that Taylor was detained at all times relevant to his appeal.

■ We note at the outset that the Ohio Supreme Court has interpreted the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article 1 of the Ohio Constitution, which both provide guarantees against unreasonable searches and seizures, to protect the same interests in a consistent manner. *State v. Robinette* (1997), 80 Ohio St.3d 234, 238–239, 685 N.E.2d 762, 766–767; *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271, 1273 at fn. 1. Furthermore, the court has declined to imbue the relevant state constitutional provision with protections greater than those afforded by the federal Constitution absent persuasive and explicit reasons to do otherwise. *State v. Geraldo* (1981), 68 Ohio St.2d 120, 125–126, 22 O.O.3d 366, 369–370, 429 N.E.2d 141, 145–146. Thus, we interpret the federal and state constitutional provisions in the context of searches and seizures to be in harmony with each other as we proceed with our analysis.

■ A police officer may perform an investigatory stop without probable cause to arrest when the officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905–906. The officer must have an objective and particularized suspicion that an individual is engaged or about to engage in criminal activity for the investigatory stop to be justified, *Andrews, supra,* at 87, 565 N.E.2d at 1272–1273, and such suspicion must be based upon a totality of the surrounding circumstances. *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044, paragraph one of the syllabus. Thus, the officer's subjective motivation for continuing a detention is irrelevant, and as long as the circumstances objectively justify the continued detention, the Fourth Amendment is not offended. *Whren v. United States* (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89; *Robinette, supra,* at 239, 685 N.E.2d at 767.

■ Even a momentary detention, however, is untenable if it is without reasonable, objective grounds. *State v. Retherford* (1994), 93 Ohio App.3d 586, 595, 639 N.E.2d 498, 504–505, citing *Florida v. Royer* (1983), 460 U.S. 491, 497–498, 103 S.Ct. 1319, 1323–1324, 75 L.Ed.2d 229, 235–237. For instance, in *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237, the Ohio Supreme Court held that a police officer, who detained an individual for a suspected traffic violation, does not have authority to detain that individual further to determine the validity of his driver's license once the officer no longer has reason to suspect that individual is committing a traffic violation, absent some specific and articulable facts that detention was reasonable. Thus, "[I]f a police officer has no reasonable and articulable suspicion that a motorist is unlicensed, a vehicle is unregistered, or that the vehicle or an occupant is otherwise subject to seizure for violation of the law, the officer cannot detain the driver in order to

check his operator's license." *State v. Venham* (1994), 96 Ohio App.3d 649, 656, 645 N.E.2d 831, 835, citing *Chatton, supra; Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660; *State v. Vance* (1991), 72 Ohio App.3d 589, 595 N.E.2d 528. See, also, *Fairborn v. Orrick* (1988), 49 Ohio App.3d 94, 550 N.E.2d 488 (holding that officer may not prolong traffic stop or extend scope of traffic stop to include checking the motorcycle operator's license where initial stop was made because of motorcycle passenger's failure to wear required eyewear and apparent intoxication). In this context, we see no principled reason to differentiate between a driver who is not or is no longer reasonably suspected of criminal activity and a passenger in a vehicle who was not the catalyst for the original stop and is not reasonably suspected of criminal activity. Finally, we observe that a trial court's application of these principles to a set of facts is reviewed *de novo* by an appellate court. See *Ornelas v. United States* (1996), 517 U.S. 690, 691, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911, 915–916; *State v. Klosterman* (1996), 114 Ohio App.3d 327, 333, 683 N.E.2d 100, 103–104.

In the present case, Taylor does not claim to have been unreasonably detained during the time Coverstone was preparing to cite Owens. Instead, he argues that his continued detention after Owens was arrested and searched was a violation of his right to be free from unreasonable seizures because Coverstone had no reasonable articulable suspicion that Taylor was engaged or about to engage in criminal activity. We agree.

Coverstone candidly testified that the sole purpose of requesting Taylor's driver's license after Owens' arrest was to check for any outstanding warrants and, after that, run a criminal history check on Taylor. No evidence was presented that Coverstone suspected Taylor was unlicensed. In addition, Coverstone had already ascertained that the Lexus was properly registered and that Taylor and his friends were in lawful possession of the vehicle. Moreover, the evidence establishes that Coverstone had no intention of searching the vehicle or its passengers until after the focus of the stop shifted from Owens to Taylor and the other passenger. In fact, Coverstone testified that he routinely cited and released individuals found to be in possession of two grams of marijuana. In other words, absent a suspicion that other criminal activity was afoot, Coverstone would not normally search the automobile of someone who possessed two grams of marijuana. Under these circumstances, it is apparent that Coverstone's continued detention of Taylor was exclusively investigatory in nature and directed toward Taylor and the other passenger.[2] Consequently, it must be justified by objective and reasonably articulable facts suggesting criminal activity on Taylor's

---

2. This technique, as testified to by Trooper Coverstone, bears remarkable, and perhaps unmistakable resemblance to a "fishing expedition."

part.[3]  Thus, the question we must resolve is whether the presence of trash and a cellular phone in the car along with the fragrance of air freshener, Owens' nervousness, and the discovery of two grams, or seven one-hundredths of an ounce of marijuana in Owens' pocket justified Coverstone's suspicion that Taylor and his companions were involved in drug trafficking.  These facts are easily divisible into two sets, the first consisting of those facts relating to the contents and condition of the car in which Taylor was riding, and the second consisting of those facts peculiar to Owens.  We consider the second group of facts first.

We are not convinced that Owens' nervousness or his personal possession of a very small amount of marijuana reasonably suggests that the three men were involved in drug trafficking.  Owens knew he was in possession of the marijuana and may also have been concerned about whether he could pass the sobriety tests conducted by Coverstone.  Either or both of these facts would explain Owens' nervousness after being asked to step out of the vehicle he was driving.  In addition, Coverstone testified that Taylor himself was at all times calm and did not appear to be nervous.  Thus, Owens' nervousness contributes little toward a reasonable and articulable suspicion that he or his passengers were engaged in drug trafficking.

That Owens was found to be in possession of two grams of marijuana adds little to the mix as well, as it is hardly indicative of drug trafficking.  In a recent case, we stated that drugs and paraphernalia found on the person of one occupant of a vehicle did not create a basis to suspect criminal activity on the part of another occupant.  *State v. Salyer* (Apr. 10, 1998), Miami App. No. 97–CA–39, unreported, 1998 WL 184651.  Similarly, under the circumstances of this case, we reject the notion that Taylor may come under suspicion of trafficking in drugs by his association with someone in possession of a minuscule amount of marijuana.  See *State v. Crosby* (1991), 72 Ohio App.3d 148, 150–151, 594 N.E.2d 110, 111–112 (rejecting state's argument that defendant's presence in an area known for drug activity and conversation from within his vehicle with an individual outside the car was indicative of drug trafficking); *State v. Fahy* (1988), 49 Ohio App.3d 160, 161, 551 N.E.2d 1311, 1313 (finding defendant's "mere association and conversation with known drug users" insufficient facts upon which to infer current drug-related activity); *State v. Bogart* (Feb. 11, 1994), Lake App. No. 93–L–088, unreported, 1994 WL 45266 (noting that "courts of this state have consistently

---

3.  In so saying, we do not suggest that Coverstone's subjective purpose in detaining Taylor beyond the duration of the original stop is dispositive.  We reserve for another day the question whether, when a driver who is not the owner of the vehicle is arrested and the vehicle is not impounded, the officer may detain the passengers to check the validity of their driver's licenses.  We note only that under *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237, it seems unlikely that the officer could lawfully do so unless the passenger-cum-driver were reasonably suspected of some separate criminal activity.

held that a person cannot be detained solely upon the ground that the person [or presumably, his companion] has a reputation for engaging in criminal behavior"). Had there been any question as to whom the marijuana belonged, if, for example, it had been seen on the driver's seat as Owens exited the car, it may have provided some basis for further investigation of the passengers.[4]  Since it was found in Owens' personal possession, however, and because it was an amount that can only be described as for personal use, we find that any suspicion it evoked in Coverstone concerning the likelihood that Taylor was trafficking in drugs was unreasonable.  Thus, we are left to determine whether Coverstone's observations of the contents and condition of the vehicle can add sufficient support to his suspicion that the three men were engaged in drug trafficking so as to justify expansion of the scope and duration of the stop.

It is recalled that when Trooper Coverstone initially stopped and approached the vehicle, he noticed that the car looked "lived in" and smelled of air freshener. In addition, he saw a cellular phone in the car, and when one of the occupants opened the glove box looking for the registration, Coverstone saw a bottle of air freshener inside the compartment.  We find these facts innocuous.

In a previous case, we found a driver's vague and less-than-definitive answers to the officer's questions, a hanging toggle switch, loose fast-food wrappers, an unconnected radar detector, and missing trim from the interior of a car insufficient to justify further detention of the driver after the purpose of the original traffic stop had been concluded.  *State v. Foster* (1993), 87 Ohio App.3d 32, 621 N.E.2d 843.  In that case, we stated as follows:

"These may be articulable facts but they certainly do not provide reasonable grounds for conducting the search.  If fast-food wrappers and a radar detector in a vehicle can justify a search of it, then we are all at risk.

"* * *

"A small set of individual facts, each one innocent in itself, does not necessarily add up to reasonable grounds for a search when taken together * * *."  *Id.* at 40–41, 621 N.E.2d at 848.

In the present case, much the same can be said of the facts that Coverstone testified led him to believe Taylor and the others were trafficking in drugs.  In today's society, we can state with certainty that the presence of a cellular phone

---

4.  We disagree with the trial court's broad statement that finding marijuana on the person of the driver of a vehicle is the equivalent, or "at least as definitive," as an officer's detection of the smell of burnt marijuana emanating from a car.  Under the latter circumstance, an officer has no way of quickly and efficiently determining which of the occupants in a vehicle were smoking the marijuana.  Thus, suspicion is cast on all the occupants.  The same is not true when marijuana, especially in minute amounts as is the case here, is found on one of the occupants.

in an automobile conveys nothing about the vehicle's occupants. People from all walks of life, from homemakers to executives, from construction workers to salesmen and women, from students to grandparents, use cellular technology for a variety of reasons, safety and convenience predominant among them. Gone are the days when possession of a cellular phone or pager might have contributed to a reasonable suspicion that criminal activity was afoot. Similarly, we discount the significance of the untidy condition of the vehicle interior as an indicator of drug trafficking. Paraphrasing *Foster, supra,* if a cellular phone in the unkempt passenger compartment of a vehicle constitutes reasonable articulable facts sufficient to justify an investigation of the occupants for drug trafficking, then we are all at risk.

This is true even in combination with the other facts Coverstone stated informed his suspicion of drug trafficking activity. As we recently stated, "[t]he circumstances [that would allow an officer to arrive at a reasonable suspicion that criminal activity is afoot] must connote criminal conduct, not necessarily to the exclusion of any other explanation[,] but in a way that makes a criminal purpose predominate as an explanation for what the officer sees." *State v. Wagoner* (Feb. 25, 2000), Montgomery App. No. 17878, unreported, 2000 WL 217401. At the time Trooper Coverstone decided to detain Taylor and the other passenger for further investigation, the facts available to Coverstone did not implicate criminal activity to such a degree that it was the predominant explanation for the situation. Consequently, based on the totality of circumstances known to Coverstone at that time, we conclude there was no reasonable articulable suspicion of separate illegal activity to warrant Taylor's continued detention.

That is not to say, however, that the circumstances in this case can never congeal with other facts not present here to form a reasonable articulable suspicion that criminal activity is occurring or about to occur. In *State v. Wynter* (Mar. 13, 1998), Miami App. No. 97–CA–36, unreported, 1998 WL 127092, for example, we found the trooper had developed a reasonable suspicion of criminal activity that justified detaining a motorist and her passenger based on the following facts: the vehicle's front license plate bolting was not standard; the car had dark windows and an after-market paint job on the late-model car; the driver's unusual driving mannerisms; furtive movements by the passenger; both driver and passenger were extremely nervous; the officer was dubious of the driver's story about her destination; the passenger gave a falsified Social Security card as her identification (which we note was requested by the officer shortly after the initial traffic stop rather than at the conclusion of the traffic stop, as in the present case); the car had no glove box or center compartment; the officer detected "an overabundance of air deodorizers"; a fuse box hung over the clutch; and the colors of the interior of the car, the dash, and the console did

not match. In addition, the Court of Appeals for Medina County found a defendant's continued detention was based on articulable facts giving rise to a suspicion of some separate illegal activity where the defendant passenger and another passenger were very quiet and abruptly answering questions put to them by the trooper; the driver had become more animated when asked about large sums of money, drugs, or weapons; the vehicle was traveling between two known source areas of drug trafficking; the vehicle had a "lived-in" look; and two of the occupants disclaimed ownership of the car, each saying the other was the owner. *State v. Napier* (May 27, 1998), Medina App. No. 2671–M, unreported, 1998 WL 281368. The court found the continued detention of the occupants for as long as it took the troopers to take an on-the-scene drug-sniffing dog from a cruiser and walk it around the suspect's car was justified. *Id.* When Trooper Coverstone decided to expand the scope and duration of the stop in the case before us, no facts capable of casting a shadow of criminality over Taylor were present. Consequently, Coverstone's continued detention of Taylor was in violation of Taylor's right to be free from unreasonable seizure guaranteed to him both by the United States Constitution and the Ohio Constitution.

The state makes two arguments not addressed above that are deserving of comment. First, it claims that Trooper Coverstone's knowledge that Owens and Taylor had previously been convicted of drug trafficking came prior to Coverstone's decision to detain Taylor after Owens was arrested and searched. The record, however, does not accord with the state's sequence of events, and instead establishes that Coverstone decided to detain Taylor before Coverstone ran a warrants or criminal history check on Taylor. Since the fact of Taylor's criminal history was not available to Coverstone at the time he made the decision to continue Taylor's detention, it cannot now be used to justify the detention.

Second, the state argues that once Coverstone found the two grams of marijuana in Owens' pocket, he had probable cause to search the vehicle. Without more, the nature of the state's argument is unclear. Probable cause to search the vehicle, if indeed it existed, would not legitimize the illegal investigation of Taylor and the other passenger. As best we can tell, the state's assertion is meant to imply that even if the evidence were illegally seized, the doctrine of inevitable discovery would justify the trial court's decision denying Taylor's motion to suppress. We cannot agree.

The Ohio Supreme Court has held that "illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation." *State v. Perkins* (1985), 18 Ohio St.3d 193, 196, 18 OBR 259, 261–262, 480 N.E.2d 763, 766–767, adopting the rule set forth in *Nix v.*

*Williams* (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377. The state bears the burden of showing "within a reasonable probability that police officers would have discovered the derivative evidence apart from the unlawful conduct." *Perkins, supra.* In doing so, the state must show that the police possessed the leads making the discovery inevitable at the time of the misconduct and that the police were actively pursuing an alternate line of investigation prior to the misconduct. *State v. Wilson* (1994), 97 Ohio App.3d 333, 336, 646 N.E.2d 863, 865–866, citing *United States v. Buchanan* (C.A.6, 1990), 904 F.2d 349, and *United States v. Webb* (C.A.5, 1986), 796 F.2d 60. Significantly, proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix, supra* at 444–445, 104 S.Ct. 2501, 81 L.Ed.2d 377, 387–388 fn. 5; *State v. Reddish* (Oct. 15, 1999), Montgomery App. No. 17323, unreported, 1999 WL 819575. We find the state failed to satisfy its burden in this respect.

Initially, we observe that the doctrine of inevitable discovery requires the state to show the illegally seized evidence *would* have been discovered in the course of a legal investigation. Here, all that can be said of the state's spare argument is that it claims the evidence *could* have been found if Coverstone had searched the car after finding a small amount of marijuana in the driver's possession. As such, the state's assertion is couched in terms of possibility rather than probability. The Fourth Amendment requires more.

Moreover, there is no evidence in the record tending to establish the Ohio Highway Patrol's routine procedures following any arrest, much less one under the circumstances present in this case. In addition, Trooper Coverstone never even intimated that he had intended to search the vehicle after finding Owens' marijuana. Instead, he pointedly stated that he relied upon the information he obtained from the illegal investigation of Taylor and the other passenger in deciding to call for a narcotics-detecting dog. Furthermore, Coverstone testified that his routine practice was to cite and release (not conduct a vehicle search, cite, and release) individuals found to be in possession of such small amounts of marijuana. Thus, on this record, there is no evidence that would allow a conclusion that Coverstone *would* have searched the vehicle and found the evidence in the trunk of the car based on the information available to him after the purpose for the original stop had been resolved. Moreover, the state produced no evidence of any leads possessed by the troopers at the time the illegal investigation of Taylor was initiated that would make discovery of the evidence in the trunk of the car inevitable, and no alternate line of investigation prior to the troopers' misconduct was existent, let alone being actively pursued. Consequently, we find the state's apparent suggestion that the antidote of inevitable discovery removes the taint from the illegally seized evidence unavail-

ing. See *State v. Wilson* (1994), 97 Ohio App.3d 333, 335–336, 646 N.E.2d 863, 864–866 (finding fact that officers could have used drug dog present on the scene did not suffice to show evidence would have been inevitably discovered); *State v. Miller* (1991), 77 Ohio App.3d 305, 602 N.E.2d 296 (stating appellee presented no evidence that items seized would have been discovered through a lawful means independent of the police misconduct and rejecting inevitable discovery claim); *State v. Lowry* (June 17, 1997), Ross App. No. 96–CA–2259, unreported, 1997 WL 337648 (finding state's failure to present evidence regarding the standard inventory procedure and its applicability to defendant's vehicle defeated its inevitable discovery claim); *State v. Everson* (Jan. 29, 1992), Summit App. No. 15246, unreported, 1992 WL 15965 (finding officer's testimony that he relied upon improperly acquired evidence to arrest and search defendant, and absence of evidence relating to routine inventory searches were fatal to state's claim that evidence would have been inevitably discovered); *State v. Whaley* (Apr. 13, 1990), Erie App. No. E–89–27, unreported, 1990 WL 42645 (concluding that if trooper had proceeded lawfully the automobile never would have been seized and subsequently searched; thus, doctrine of inevitable discovery was inapplicable); *State v. Harris* (Sept. 29, 1989), Montgomery App. No. 11309, unreported, 1989 WL 113134 (suggesting that absence of evidence showing routine procedures following arrest would prove fatal to state's claim that evidence would have been inevitably discovered); *State v. Masten* (Sept. 29, 1989), Hancock App. No. 5–88–7, unreported, 1989 WL 111983(stating that "[w]hile there was undoubtedly sufficient probable cause to obtain a search warrant * * * in this case, we find that the mere fact that a search warrant would in all probability have been issued on request cannot be considered as the implementation of investigative procedures that would have ultimately led to the 'inevitable' discovery of the evidence").

Because we have found the troopers illegally expanded both the scope and duration of the traffic stop to investigate the passengers and that the evidence seized as a result of the improper investigation would not have been inevitably discovered, we sustain Taylor's sole assignment of error. The trial court's judgment is reversed, and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

GRADY, P.J. and GLASSER, J., concur.

GEORGE M. GLASSER, J., retired, of the Sixth Appellate District, sitting by assignment.