[Cite as *State v. Young*, 2015-Ohio-398.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. E-13-011 |
| Appellee | Trial Court No. 2011-CR-244 |
| v. | |
| James M. Young | **DECISION AND JUDGMENT** |
| Appellant | Decided: January 30, 2015 |

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, Mary Ann
Barylski and Frank Romeo Zeleznikar, Assistant Prosecuting
Attorneys, for appellee.

Derek A. Farmer, for appellant.

* * * * *

**JENSEN, J.**

**{¶ 1}** Following a jury trial, defendant-appellant, James M. Young, appeals from

the February 28, 2013 judgment of the Erie County Court of Common Pleas,

memorializing his convictions on various drugs and weapons charges, and the

accompanying decisions of the trial court rendered during the course of the proceedings. For the reasons that follow, we find Young's first assignment of error well-taken and we reverse the trial court's judgment.

## I. Background

{¶ 2} On the morning of June 4, 2011, Agent Dennis Rulli, a lead border patrol agent with the U.S. Customs and Border Protection agency, received a call from a confidential informant ("CI") indicating that Young and Anthony Henson were at Young's residence, 508 East Jefferson Street in Sandusky, Ohio, cooking crack cocaine. The CI said that they would be leaving the house and traveling to Farwell Street with an ounce or two of crack cocaine. Rulli contacted Lieutenant John Orzech, of the Sandusky Police Department, to report this information. Orzech was not on duty at the time, but he arranged to have Sergeant Danny Lewis contact Rulli. When Rulli and Lewis spoke, they made plans to conduct surveillance of Young's home. Lewis arrived first in his squad car. When Rulli arrived in an unmarked vehicle, Lewis moved away so as not to be detected.

{¶ 3} Rulli observed a black male leave the East Jefferson Street residence on a bicycle. He informed Lewis who headed in the direction of the bicyclist. Soon after, Young and Henson left the home in a black Hummer. Young drove and Henson got in the passenger side. Rulli informed Lewis and began to follow the vehicle. Lewis caught up and resumed following Young while Rulli returned to East Jefferson Street.

2.

{¶ 4} As Lewis followed Young's vehicle, he observed that the county sticker and the top portion of his license plate were partially obstructed, and he found the validation sticker difficult to read. Lewis believed this to be a violation of state and local laws. As the vehicle turned onto Farwell Street, Lewis activated his lights and initiated a traffic stop. He asked to see Young's identification. Young did not have his license with him and Lewis observed that Young appeared nervous. He was allegedly shaking and mumbling. Lewis called for the K-9 unit to be dispatched.

{¶ 5} The K-9 unit arrived. Justice, the drug-sniffing dog, alerted to the presence of drugs. Lewis asked Young and Henson if they had drugs with them and Henson handed over a plastic baggie of suspected crack cocaine. The crack cocaine was contained within a cupcake wrapper. Lewis had conducted a 2006 investigation in which Young sold drugs packaged in cupcake wrappers. Lewis searched the vehicle but found no other drugs or contraband. He arrested Henson. He also arrested Young for permitting drug use. He contacted Orzech to advise him of the events.

{¶ 6} Lewis left the place of the stop and returned to East Jefferson Street. There he found Rulli speaking with a woman named Jenny Bailey who was there for a short time to speak with Young's mother, Lutricia Bradley. Rulli stayed with Bailey, who he placed in the back of Lewis' squad car, while Lewis and other officers went to the door of the residence. Lewis knocked on the door. He claims that he heard footsteps and running water and heard someone say "it's the police." Allegedly concerned that evidence was being destroyed, he and the other officers forced entry into the home with guns drawn.

3.

{¶ 7} Inside the home, Lewis saw Bradley shoving what appeared to be crack cocaine down the kitchen sink with a butter knife. Lewis instructed Bradley to move away from the sink. She did not comply so he went to the sink, turned off the water, and directed Bradley to sit at the kitchen table. Chad Young, either Young's brother or son (it is unclear from the record), was also in the residence, running towards the back of the home. He complied with the officers' orders to return to the kitchen. His girlfriend, Keisha Hargrove, was in a bedroom and she, too, complied with orders to come to the kitchen. Her minor son was also present. Lewis did not check the remaining rooms in the house. He asked Bradley for permission to search the home. She refused.

{¶ 8} Orzech arrived and Rulli entered the residence. Orzech and Lewis left to obtain a search warrant while Rulli and other officers stayed with the occupants. Orzech, with information obtained from Lewis, drafted the affidavit for search warrant and Lewis prepared the cover sheets.

{¶ 9} In his affidavit, Orzech described that in 2006, with assistance from a CI,[1] Lewis and other officers arranged multiple controlled drug buys from Young and a female associate. In the course of that investigation, they executed a search warrant that led to Young's arrest on charges of trafficking in marijuana, trafficking in cocaine, trafficking in crack cocaine, possession of cocaine, and possession of crack cocaine. Young allegedly pled to some of these charges and served some amount of prison time.

---

[1] The 2006 investigation did not involve the same CI as the present case.

{¶ 10} Orzech then detailed the June 4, 2011 events. He recounted that the CI had told Rulli that Young and Henson were cooking crack cocaine and would be leaving 508 East Jefferson Street with an ounce or two of crack cocaine, traveling to the Farwell Street address. He described that based on this information, Lewis and Rulli set up surveillance at the East Jefferson Street address. Young and Henson left the residence in a black Hummer, Lewis followed, and he pulled the vehicle over for obstructed plates violations as it turned onto Farwell Street. He indicated that the K-9 unit arrived and alerted to the presence of drugs in the vehicle, and that a baggy of suspected crack cocaine was found in Henson's pants pocket.

{¶ 11} Orzech then detailed what was observed by the officers upon their warrantless entry into the home. He stated that the K-9 unit arrived at East Jefferson Street and conducted an open-air search of the vehicles there, alerting to a white Denali registered to Newman's Motors—a dealership allegedly frequented by Young. According to the affidavit, Young told Lewis that he resides at 508 East Jefferson Street.

{¶ 12} In his affidavit, Orzech attested that he knows the CI to be reliable and to have assisted the Sandusky Police Department with investigations leading to the arrest and convictions of at least five individuals for drug-related offenses, more than 15 drug buys, and the recovery of more than 10 ounces of crack cocaine, money, and other paraphernalia.

{¶ 13} Orzech took the warrant application to a judge while Lewis returned to the residence. Orzech telephoned Lewis after obtaining a signature on the warrant, and

5.

Lewis and the other officers began searching the home. In the kitchen they found crack cocaine in the sink. There was a Mason jar next to the sink that purportedly contained crack cocaine. Rubber gloves and pipes from the sink were found to contain crack cocaine and there were cupcake wrappers. In Chad Young's bedroom there was a thermometer, a scale, a razor blade with residue, and a round of ammunition, but no weapon. His identification was found in an end table drawer. In the southeast bedroom, which Bradley identified as Young's bedroom, they found cocaine, a gun, scales, plastic bags, cupcake wrappers, spoons, and paraphernalia. There was also some cash, jewelry, and watches, various mail and other documents with Young's name on it, manuals to a vehicle, and pictures of Young standing outside the home. Officers found several guns in the back of the residence by the laundry room. Nothing was found in Bradley's bedroom.

{¶ 14} Young was indicted on ten counts of having weapons under disability, under R.C. 2923.13; permitting drug abuse, under R.C. 2925.13; complicity to commit trafficking in crack cocaine, under R.C. 2925.03 and 2923.02; possession of cocaine, under R.C. 2925.11; and, later, complicity to commit interference with forfeitable property, under R.C. 2981.07. In a motion dated October 13, 2011, he moved the court to suppress evidence and to suppress his arrest. He claimed that the state lacked reasonable articulable suspicion for the traffic stop, that he was unlawfully detained pending arrival of the K-9 unit, that the state lacked probable cause to obtain the warrant to search his home, that there did not exist exigent circumstances to justify the warrantless entry into the residence, and that there was no probable cause for his arrest. The state opposed the

6.

motion and the trial court conducted a two-day hearing at which Rulli, Lewis, Orzech, and Young testified.

{¶ 15} The trial court denied Young's motion to suppress on April 25, 2012, and on January 15, 2013, it adopted findings of fact and conclusions of law submitted by the state. It also cited *State* v. *Coleman*, 12th Dist. Fayette No. CA2011-09-020, 2012-Ohio-3630, in support of its decision, explaining that under that authority, the initial stop of Young's vehicle was proper.

{¶ 16} The matter ultimately proceeded to a jury trial. The jury convicted Young of all charges. He was sentenced to a net prison term of 96 months. He filed a timely notice of appeal and assigns the following errors for our review:

> I. Whether the initial stop of Mr. Young's vehicle, along with his arrest and subsequent search of his residence constitute violations of the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

> II. Whether Mr. Young's Convictions are supported by Insufficient evidence and are against the manifest weight of the Evidence in violation of the Fourteenth Amendment to the United States Constitution and it [sic] Ohio counterpart.

> III. Whether the trial court committed error when it failed to sever Appellant's trial from his co-defendant's and when itadmitted [sic] hearsay

testimony in violation of Ohio Rule of Evidence 801(D)(2) and the Sixth Amendment to the United States Constitution.

IV. Whether Mr. Young's Sixth Amendment Right of Confrontation was violated where the trial court permitted a non-testifying informant's statement be used as substantive evidence [sic].

V. Whether the trial court erred when it permitted "other act"evidence [sic] of prior conviction and did not limit testimony concerning the details of a prior conviction consistent with Ohio Rule of Evidence 403 (B) and the Fourteenth Amendment to the United States Constitution.

VI. Whether the trial court erred when it impermissibly confronted defense witness in front of the jury when the witness Invoked his Fifth Amendment [sic] against self-incrimination, in violation of the Fourteenth Amendment to the United States Constitution.

{¶ 17} For the reasons that follow, we find Young's first assignment of error well-taken, thereby obviating the need to address the remaining assignments of error.

## II. Standard of Review

{¶ 18} Appellate review of a motion to suppress is a mixed question of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. On a motion to suppress, the trial court assumes the role of finder of fact and, as such, is in the best position to determine witness credibility and to resolve factual disputes. *State v.*

8.

*Codeluppi,* 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). On appeal, we must accept the trial court's factual findings as true if supported by competent and credible evidence. *State v. Durnwald,* 163 Ohio App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234, ¶ 28 (6th Dist.). We then independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard. *State v. Jones-Bateman,* 6th Dist. Wood No. WD-11-074, 2013-Ohio-4739, ¶ 9, citing *State v. Claytor,* 85 Ohio App.3d 623, 626, 620 N.E.2d 906 (4th Dist.1993).

### III. Analysis

{¶ 19} In his first assignment of error, Young argues that the initial stop of his vehicle, his detention pending arrival of the K-9 unit, his arrest, the warrantless entry into the East Jefferson Street apartment, and the search of the residence violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution, thus the trial court erred in denying his motion to suppress. We address each of these claims in turn. In doing so, we rely on the information contained in the affidavit for search warrant and the testimony and evidence presented at the suppression hearing.

### A. The Traffic Stop

{¶ 20} Lewis testified that he stopped Young's vehicle because his license plate was obstructed. He said that the county sticker was blocked, the words across the top of the plate were obstructed by a silver eagle bracket, and he found part of the validation

9.

sticker difficult to read because it was placed partially over one of the numbers on the license. He understood that the Ohio Revised Code and a city ordinance required these parts of the plate be visible at all times, so he initiated the stop. Lewis conceded on cross-examination that once he stopped the vehicle and exited the police cruiser, he did not try to read Young's license plate. He indicated that he issued a written warning for the obstructed plates violation, but did not present it to Young until after he was arrested.

{¶ 21} To legitimately effectuate a traffic stop, an officer must have a reasonable and articulable suspicion of criminal activity. *State v. Hageman*, 180 Ohio App.3d 640, 2009-Ohio-169, 906 N.E.2d 1158, ¶ 11 (6th Dist.). Once the officer has initiated the stop, he or she may detain the vehicle no longer than is necessary to carry out the purpose of the stop which typically amounts to "a time period sufficient to issue a ticket or a warning." *State v. Kelly*, 188 Ohio App.3d 842, 2010-Ohio-3560, 937 N.E.2d 149, ¶ 25 (12th Dist.).

{¶ 22} R.C. 4503.21(A) provides that:

No person who is the owner or operator of a motor vehicle shall fail to display in plain view on the front and rear of the motor vehicle the distinctive number and registration mark, including any county identification sticker and any validation sticker * * *. All license plates shall be securely fastened so as not to swing, and shall not be covered by any material that obstructs their visibility.

10.

**{¶ 23}** Photographs of the license plate were admitted as exhibits during the suppression hearing.  Those photographs demonstrate that the top portion of the license plate that reads "Ohio" and, under it, "Birthplace of Aviation," was covered by an eagle emblem on the decorative bracket bordering Young's license plate.  The photos also demonstrate that the bottom half of the county sticker was obscured by that bracket.

**{¶ 24}** In support of his position that Lewis lacked reasonable, articulable suspicion to initiate the stop, Young cites *State v. Brooks,* 11th Dist. Lake No. 2005-L-200, 2007-Ohio-344.  In *Brooks,* the officer stopped defendant's vehicle because the rear bracket made it impossible to see the county and validation sticker on his license plate. *Id.* at ¶ 6.  When shown a photo of the plate, the officer indicated that he could partially read the numbers, but emphasized that he could not read them at all at the time he initiated the traffic stop.  *Id.* at ¶ 18.  The trial court found that the stickers were partially obstructed—"less than one-quarter of the tags were covered by the frame."  *Id.* at ¶ 34.  The appellate court considered whether R.C. 4503.21 strictly prohibits *any* obstruction.  It recognized that the purpose of the statute is to ensure that license plates are "visible to law enforcement personnel and others who may have reason to note the number for identification purposes."  *Id.* at ¶ 35, quoting *State v. Durfee,* 11th Dist. Lake No. 96-L-198, 199, 1998 WL 156857, *8 (Mar. 6, 1998).  It interpreted that to violate the statute, one must be unable to read the numbers at all.  *Id.* at ¶ 36.  Because the photos admitted at the suppression hearing showed that the numbers could, in fact, be read, the court

11.

concluded that the officer lacked probable cause to stop the defendant's vehicle. *Id.* at ¶ 37, 39.

{¶ 25} The state relies on *State v. Phillips,* 2d Dist. Montgomery No. 22918, 2009-Ohio-3519, and *State v. Craze,* 5th Dist. Ashland No. 09COA 017, 2010-Ohio-812. In *Phillips,* there was a temporary plate on defendant's car that had a tinted cover over it which was further obstructed by dirt and salt, rendering the officer unable to read the plate. *Id.* at ¶ 3. Upon stopping and approaching the vehicle, the officer was ultimately able to read the plate. *Id.* at ¶ 4. The defendant argued that because the officer could ultimately read the plate, he lacked reasonable, articulable suspicion to justify stopping and detaining him. *Id.* at ¶ 7. The court disagreed. It also distinguished a number of cases where other Ohio courts had found similar stops to be unjustified. In *Craze,* the officer could not see the expiration date on the validation sticker until she walked up to the plate and pointed her flashlight on it. The court held that the condition of the plate violated the statute and that the officer properly initiated the stop.

{¶ 26} From the photograph and the testimony presented at the suppression hearing, it is apparent that, unlike *Brooks,* the county sticker on Young's vehicle was obstructed to the point of being unreadable. Because the obscured county sticker violated R.C. 4503.21, we find that the initial stop of Young's vehicle was proper.

**B. Detention Pending Arrival of the K-9 Unit**

{¶ 27} Despite our finding that reasonable, articulable suspicion existed to support the initial stop of the vehicle for the R.C. 4503.21 violation, there are problems with the

12.

traffic stop. Specifically, Lewis lacked reasonable articulable suspicion to detain Young for the amount of time that it took the drug-detecting dog to arrive.

{¶ 28} After checking Young's information in LEADS, Lewis asked him if there was anything illegal in the vehicle. Young replied that there was not. He asked permission to search the vehicle, and Young refused. Lewis said that Young and Henson appeared nervous and that he could literally see Young's heart pounding in his chest. Lewis decided to call the K-9 unit to the scene. He testified that it took 15-25 minutes for the unit to arrive. Young testified that it took one and one-half to two hours. A review of the recording of the traffic stop, which was marked as an exhibit, reflects that Young's vehicle was pulled over at 12:01 p.m. and that the K-9 unit arrived at 12:26 p.m.

{¶ 29} A K-9 sniff is not a search within the meaning of the Fourth Amendment, thus police are not required to have reasonable suspicion that a car contains drugs prior to subjecting a lawfully detained vehicle to a K-9 sniff. *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 13. "However, police must have reasonable suspicion that a vehicle contains drugs in order to detain a suspect while a drug sniffing dog is brought to the scene." *Id.,* citing *State v. Kerns,* 2d Dist. Montgomery No. 18439, 2001 WL 257837 (Mar. 16, 2001).

{¶ 30} In *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E.2d 1138 (6th Dist.), we recognized that "the scope of a detention must be carefully tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop." (Internal citations and quotations omitted.) *Id.* at ¶ 18. We

13.

explained that "an officer should, on average, have completed the necessary checks and be ready to issue a traffic citation in approximately 15 minutes." *Id.* at ¶ 23, citing *State v. Johnson*, 6th Dist. No. L-06-1035, 2007-Ohio-3961, ¶ 10; *State v. Meza,* 6th Dist. No. L-03-1223, 2005-Ohio-1221, ¶ 9. In that case, we held that the officer impermissibly expanded the length and scope and prolonged the traffic stop. *Id.* at ¶ 24.

{¶ 31} Here, Lewis did not issue a citation during the 25 minutes they waited for the K-9 unit. He testified that he ultimately issued only a written warning which he did not provide to Young until he was arrested. Because the detention was longer than necessary to issue a traffic citation or written warning, we find that Lewis impermissibly expanded the length and scope of the traffic search.

{¶ 32} The state argues that Young and Henson appeared very nervous and that Young was mumbling and speaking in broken sentences, thereby arousing reasonable, articulable suspicion justifying Lewis' decision to prolong detention pending arrival of the K-9 unit. However, it is not uncommon for a person to become nervous after being pulled over by the police. We, therefore, assign little significance to this fact. *See State v. Taylor*, 138 Ohio App.3d 139, 147, 740 N.E.2d 704 (2d Dist.2000) ("[Defendant's] nervousness contributes little toward a reasonable and articulable suspicion that he or his passengers were engaged in drug trafficking.").

{¶ 33} We agree with Young that he was unlawfully detained pending arrival of the K-9 unit.

14.

## C.  Young's Arrest and Search

{¶ 34} Once the K-9 unit arrived, the drug-detecting dog, Justice, quickly alerted to the presence of drugs in the vehicle.  At that point, Henson turned over approximately a half-ounce of crack cocaine, wrapped in a cupcake wrapper, retrieved from his front pants pocket.  He was arrested.  Despite a subsequent search of the vehicle that uncovered no additional drugs or other contraband, Young was also arrested and charged with permitting drug abuse.  He was also patted down, at which time he was found to be carrying $1,280.  Young argues that his arrest and pat down were improper because the officers lacked probable cause to believe that Young had committed any crime.  The state argues that between the tip from the CI, Henson's possession of drugs, the $1,280 found on Young when he was searched, and the fact that the crack cocaine Henson was carrying was packaged in a cupcake wrapper—purportedly Young's modus operandi—there existed probable cause to arrest Young.  It contends that Lewis had probable cause to believe that Young knew that Henson was carrying drugs, that a reasonable police officer would believe that Young sold it to Henson, and that Young was involved in other drug-related felonies.

{¶ 35} Probable cause to conduct a warrantless arrest exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information to warrant a belief by a prudent person that an offense has been committed by the person to be arrested.  *State v. Graves*, 173 Ohio App.3d 526, 2007-Ohio-4904, 879 N.E.2d 239, ¶ 13 (6th Dist.), citing *Beck v. Ohio*, 379 U.S. 89, 91,

15.

85 S.Ct. 223, 13 L.Ed.2d 142 (1964). R.C. 2925.13(A) provides that "[n]o person who is the owner, operator, or person in charge of a * * * vehicle * * * shall knowingly permit the vehicle to be used for the commission of a felony drug abuse offense."

{¶ 36} As previously discussed, the discovery of the drugs packaged in cupcake wrappers was made pursuant to an unlawful stop and unlawfully-prolonged detention. Moreover, the state cites nothing in the transcript to support its assertion that Young was aware that Henson had drugs concealed in his front pants pocket. We agree with Young that the officers lacked probable cause to arrest him.

### D. The Warrantless Entry into the Home

{¶ 37} After Young and Henson were arrested, Lewis returned to the East Jefferson Street apartment where he and the other officers and agents on the scene intended to secure the premises. In doing so, they decided to confront the occupants. They twice knocked on the door and, after allegedly hearing water running, footsteps, and someone call out, "it's the police," the officers forcibly entered the apartment with guns drawn.

{¶ 38} Absent exigent circumstances, officers may not enter a home without voluntary consent or a judicially-sanctioned warrant. *Wauseon v. Leveck*, 6th Dist. Fulton No. F-13-020, 2014-Ohio-3360, ¶ 10. It has long been recognized, however, that the prevention of imminent destruction of evidence can constitute an exigent circumstance. *State v. Stacey*, 6th Dist. Ottawa No. OT-13-002, 2013-Ohio-4422, ¶ 33, citing *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650

16.

(2006). "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *State v. Cal,* 6th Dist. Ottawa No. OT-03-025, 2004-Ohio-1329, ¶ 11, quoting *Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

**{¶ 39}** The U.S. Supreme Court explained in *Kentucky v. King,* 131 S.Ct. 1849, 1858, 179 L.Ed.2d 865 (2011):

> [W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement. Therefore, * * * the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where * * * the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.

Where, however, the police create their own exigency by engaging in conduct that violates the Fourth Amendment, warrantless entry into a home will not be condoned. *Stacey* at ¶ 34.

**{¶ 40}** The state argues that officers properly entered the apartment before obtaining a warrant because (1) the tip from the CI was corroborated when Lewis stopped Young and found crack cocaine on Henson; and (2) it was possible that the occupants would learn—perhaps from Bailey—that Young and Henson had been arrested, leading

17.

them to destroy evidence. It claims that the sounds the officers heard coming from the apartment were consistent with that concern.

{¶ 41} Young argues that given the design of the house, Lewis could not have heard what he claimed to hear. He claims that a bottle cap found in the sink, which was photographed, was not filled with water, thus refuting Lewis' claim that the water was running. He also complains that Lewis did not announce himself as a police officer, there was no controlled drug buy, Lewis did not observe any illegal activity, and there was no smell of drugs emanating from the apartment.

{¶ 42} Lewis conceded at the suppression hearing that the information provided by the CI indicated only that Young and Henson were cooking crack cocaine in the apartment. He or she made no mention of additional participants or other drugs that would be found in the residence. The officers were obviously aware that Young and Henson had been arrested and were not inside the apartment cooking crack cocaine. Lewis also conceded that despite his concern that someone in the house may be destroying evidence, he did not conduct a protective sweep of the entire house. And, as we have already explained, Young and Henson were unlawfully detained while awaiting arrival of the K-9 unit, thus the fact that Henson was found to be carrying drugs should play no role in legitimizing the officers' conduct. As to the running water and the footsteps, on remand after appeal to the U.S. Supreme Court, the Supreme Court of Kentucky in *King v. Commonwealth,* 386 S.W.3d 119, 122 (Ky. 2012), held that "ordinary household sounds" did not justify officers' warrantless entry into a home. *See*

18.

*also State v. Burks,* 8th Dist. Cuyahoga No. 92736, 2010-Ohio-658, ¶ 12, 16 (finding that exigent circumstances did not exist despite officers hearing water running and toilet flushing).

{¶ 43} For these reasons, we find the warrantless entry into the East Jefferson Street home violated the Fourth Amendment.

### E.  The Search Warrant

{¶ 44} Finally, Young challenges the sufficiency of the affidavit in support of the application for search warrant.  He complains that it does not indicate at what time the CI contacted Rulli, it omits any mention of how the CI became aware of the information, the search warrant is too broad in that it sought, inter alia, firearms and paraphernalia when those items were not referenced in the affidavit for search warrant, and the affiant, Orzech, lacked personal knowledge given that the information included in the affidavit had been supplied by Lewis.

{¶ 45} Before the issuance of a search warrant, probable cause must be demonstrated in an affidavit or oath.  The Fourth Amendment to the U.S. Constitution; Ohio Constitution, Article I, Section 14; Crim.R. 41(C).  On appeal, we must "determine whether or not the affidavit provided the issuing magistrate with a substantial basis for determining the existence of probable cause." *State v. Rodriguez,* 64 Ohio App.3d 183, 187, 580 N.E.2d 1127 (6th Dist.1989), citing *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  The focus of a probable cause determination is "the totality of the circumstances presented in the affidavit, not each component standing

19.

alone." *State v. Brooks,* 6th Dist. Sandusky No. S-87-64, 1988 WL 134181, *2 (Dec. 16, 1988), citing *Gates* at 230-34.

{¶ 46} Probable cause must be determined as of the date the warrant is requested, thus the facts presented must be relatively close in time to the date of the affidavit to be of value in making the probable cause determination. *State v. Sautter,* 6th Dist. Lucas No. L-88-324, 1989 WL 90630, *3 (Aug. 11, 1989). Whether facts are "too stale" to be of probative value must be decided on a case-by-case basis. *Id.* In *State v. Goble*, 2014-Ohio-3967, 20 N.E.3d 280, ¶ 11 (6th Dist.), for instance, we found that a three-year-old incident was too stale to have been of value in making a probable cause determination. The Sandusky Police Department's 2006 investigation into Young's possession and trafficking of drugs falls into the category of information that is too stale to rely upon in considering whether probable cause exists to issue a search warrant. *See also State v. Williams*, 173 Ohio App.3d 119, 2007-Ohio-4472, 877 N.E.2d 717, ¶ 16 (6th Dist.) (holding that evidence seized during investigation two years earlier was not verification that current drug activity was afoot).

{¶ 47} Turning to the information from the CI, the Ohio Supreme Court has held that although a magistrate may consider information provided by hearsay statements of a CI, it may do so only if there is a substantial basis for crediting the statements. *State v. Gill,* 49 Ohio St.2d 177, 179, 390 N.E.2d 693 (1977). "[T]hat substantial basis must include (1) information about the facts upon which the informant based his allegations of criminal activity, and (2) some of the underlying circumstances from which the officer

20.

concluded that the informant was credible or his information reliable." (Internal quotations and citations omitted.) *Id.*

{¶ 48} Although the affidavit submitted by Orzech details instances which tend to show that the CI is credible, there is nothing in the affidavit detailing the source of the CI's information that Young and Henson would be cooking crack cocaine. Without these details, "[t]he magistrate in this situation would not know whether the informant's conclusion rested upon first-hand knowledge gained through his own observation, whether it rested upon information given the informant by a third person and, if so, how that person, even if reliable, acquired his information, or, whether the informant's conclusion rested upon rumor or gossip circulating in the neighborhood." *State v. Graddy,* 55 Ohio St.2d 132, 139, 378 N.E.2d 723 (1978). Because the affidavit lacks these details, the information from the CI was improperly considered by the magistrate in making a probable cause determination.

{¶ 49} The remaining information in the affidavit was based on what the officers perceived when they made their warrantless entry into the home which, as explained previously, may not be considered.

{¶ 50} We, therefore, agree with Young that there existed no probable cause to issue the search warrant.

21.

### F.  Good Faith Exception

**{¶ 51}** In some situations, a "good faith exception" exists to the general rule excluding evidence obtained pursuant to an invalid search warrant.  *Goble*, 2014-Ohio-3967, 20 N.E.3d 280 at ¶ 17.  As we explained in *Goble,* this exception provides:

> "Where evidence is obtained by police acting in *objectively reasonable reliance* on a search warrant issued by a detached and neutral magistrate or judge, which is later discovered to be unsupported by probable cause, the evidence seized remains admissible."  In determining whether an officer's reliance was "objectively reasonable," we consider whether a reasonably well-trained officer would have known that the search was illegal, despite the issuance of the warrant.  The state bears the burden of proof.  (Internal citations omitted.)  *Id.*

**{¶ 52}** Here, given the number of missteps that occurred in obtaining the evidence at issue, we find that a reasonably well-trained officer would have known the search was illegal.  We, therefore, suppress Young's arrest, as well as the evidence obtained as a result of the arrest, the unlawfully-prolonged detention during the traffic stop, the warrantless entry into the residence, and the wrongfully-issued search warrant.  Because of this conclusion, we need not address Young's remaining assignments of error.

## IV.  Conclusion

{¶ 53} We find Young's first assignment of error well-taken and we find that assignment of error dispositive of his appeal.  We reverse the April 25, 2012 and January15, 2013 judgments of the Erie County Court of Common Pleas denying his motion to suppress, as well as the February 18, 2013 judgment of his conviction and sentence, and we remand this matter to the trial court for proceedings consistent with this decision.  The state is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____

                 JUDGE

Thomas J. Osowik, J.

                 _____

James D. Jensen, J.         JUDGE

CONCUR.

                 _____

                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.