[Cite as *State v. Penwell*, 2021-Ohio-1216.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-74 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-73 |
| | : | |
| DANIEL PENWELL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of April, 2021.

. . . . . . . . . . .

IAN RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

CHARLES M. BLUE, Atty. Reg. No. 0074329, 401 East Stroop Road, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

**{¶ 1}** Defendant-appellant, Daniel Penwell, appeals from his conviction for one count of possession of a controlled substance, a fifth degree felony pursuant to R.C. 2925.11(A) and (C)(1)(a). Raising one assignment of error, Penwell argues that his conviction should be reversed because the trial court erred by overruling his motion to suppress evidence obtained during a search of his person. We find that the trial court properly overruled Penwell's motion, and his conviction is therefore affirmed.

## I. Facts and Procedural History

**{¶ 2}** On October 11, 2017, Penwell was admitted to Springfield Regional Medical Center to be treated for a possible overdose. Judgment Entry 1, Sept. 11, 2019. Officers Freeman and Sanders of the Springfield Police Division, who were already on the premises for an unrelated matter, were dispatched to speak with Penwell "in reference to his overdose." Transcript of Proceedings on Motion to Suppress 4:24-5:6, Aug. 6, 2019 [*hereinafter* Transcript]. The officers were told that medical personnel had administered Narcan to Penwell and that he had responded favorably to the treatment. *Id.* at 5:7-5:21 and 11:18-12:4.

**{¶ 3}** When the officers approached him, Penwell lay on a bed in a corridor in the emergency department. *Id.* at 8:1-10:21; Judgment Entry 1. The officers spoke with him, and Officer Freeman asked him whether he had consumed any illicit drugs and requested permission to search his person. Transcript at 5:7-6:4. Penwell consented. *Id.* The officers did not deliver a *Miranda* warning because Penwell "wasn't under arrest" and gave his consent to the search. *Id.* at 6:10-7:10.

**{¶ 4}** In a pocket in Penwell's pants, Officer Freeman found two capsules, "one of which was empty and [the other of which] had a tan substance in it." *Id.* at 6:5-6:9.

Chemical analysis later revealed that the tan substance was Carfentanil, a Schedule II drug. Judgment Entry 2; Ohio Adm.Code 4729:9-1-02(B)(6).[1] The amount of the drug recovered was 0.10 grams, which was less than the statutory "bulk amount." Judgment Entry 2; R.C. 2925.01(D)(1)(d);[2] Ohio Adm.Code 4729:9-1-02(B)(6).

{¶ 5} On January 29, 2018, a Clark County grand jury issued an indictment against Penwell, charging him with one count of aggravated possession of a controlled substance in violation of R.C. 2925.11(A). Penwell pleaded not guilty at his arraignment on June 25, 2019, and on July 29, 2019, he moved to suppress the evidence found on his person by Officer Freeman, as well as any statements he made while being questioned. Following a hearing held on August 6, 2019, the trial court overruled the motion. Judgment Entry 7. Penwell then entered a plea of no contest on September 12, 2019, in exchange for the State's agreement to recommend community control at his sentencing. The trial court, however, was apprised during the disposition hearing on October 3, 2019, of an outstanding warrant against Penwell in Indiana, so it sentenced him to serve seven months in prison. Penwell timely filed a notice of appeal to this court on October 25, 2019.

## II. Analysis

{¶ 6} For his single assignment of error, Penwell contends that:

THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S

---

[1] In October 2017, Schedule II was defined by R.C. 3719.41, which has since been amended.

[2] R.C. 2925.01 has been amended since October 2017, though the provisions of R.C. 2925.01(D)(1)(d) remain substantially the same.

MOTION TO SUPPRESS IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 14 OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶ 7} Penwell argues that the trial court erred for two reasons. First, Penwell maintains that his encounter with police officers on October 11, 2017, was not consensual under the circumstances. Appellant's Brief 11-15. Second, Penwell denies that he voluntarily consented to the search of his person. *Id.* at 15-17.

{¶ 8} Appellate "review of a [trial court's ruling on a] motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. As the trier of fact, a trial court "is in the best position to weigh * * * evidence * * * and evaluate [the credibility of] witness[es]," so an "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Graves*, 12th Dist. Clermont No. CA2015-03-022, 2015-Ohio-3936, ¶ 9, citing *State v. Cruz*, 12th Dist. Preble No. CA2013-10-008, 2014-Ohio-4280, ¶ 12. Accepting the trial court's findings of fact as true, "the appellate court must then independently determine, without deference to the [trial court's legal] conclusion[s]," whether the "facts satisfy the applicable * * * standard." *Burnside* at ¶ 8, citing *Fanning* and *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (3d Dist.1997).

{¶ 9} The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also State v. Taylor*, 138 Ohio App.3d 139, 145, 740 N.E.2d 704

(2d Dist.2000) (noting that "the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article 1" of the Ohio Constitution "protect the same interests in a consistent manner"). Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of the "few specifically established and well-delineated exceptions." (Citations omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A consensual search is one of these exceptions. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Weisgarber*, 2017-Ohio-8764, 88 N.E.3d 1037, ¶ 15-16 (2d Dist.); *State v. Rogers*, 2d Dist. Montgomery No. 24848, 2012-Ohio-4753, ¶ 12.

{¶ 10} Interactions among police officers and citizens take one of three forms: consensual encounters, investigatory detentions, and arrests. *See, e.g.*, *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.). An "encounter between a police officer and a member of the public is consensual if a reasonable person would feel free to disregard the officer's questions or [to] terminate the encounter and go about his * * * business." *City of Columbus v. Beasley*, 2019-Ohio-719, 132 N.E.3d 1201, ¶ 41, citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also Weisgarber* at ¶ 16 (stating that a consensual encounter "occur[s] when [a] police [officer] merely approach[es] a person in a public place and engage[s] the person in conversation, [with] the person remain[ing] free * * * to [refuse to] answer and * * * walk away"). By contrast, a person is "subject to an investigatory detention when, in view of all the [attendant] circumstances * * *, a reasonable person" would believe "that he [is] not free to leave or is [otherwise] compelled to respond to questions." *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 22, citing *U.S. v. Mendenhall*, 446 U.S. 544,

553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

{¶ 11} Consensual encounters "are not seizures, and [they do not implicate] Fourth Amendment guarantees." *Weisgarber* at ¶ 16, citing *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995). A "consensual encounter remains consensual even if police officers ask questions, ask to see [a] person's identification, or ask to search the person's belongings, provided [that] 'the [officers] do not convey [the] message that compliance with their requests is required.' " *State v. Westover*, 2014-Ohio-1959, 10 N.E.3d 211, ¶ 16 (10th Dist.), quoting *Bostick* at 435, and citing *Florida v. Rodriguez*, 469 U.S. 1, 4-6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984), and *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

{¶ 12} The determination of whether an encounter is consensual should be focused on the conduct of the police officers involved, rather than the state of mind of the person with whom the officers interact. *See, e.g., State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25. Among other things, "[f]actors that might indicate [that a person's interaction with police officers is an investigatory detention, as opposed to a consensual encounter,] include the threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer[s'] request might be required, approaching the person in a nonpublic place, and blocking the [person]'s path." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 13, citing *Mendenhall* at 554 and *State v. Cook*, 2d Dist. Montgomery No. 20427, 2004-Ohio-4793, ¶ 11.

{¶ 13} In the first part of his argument, Penwell posits that his encounter with police

officers was not consensual because the part of the hospital in which the encounter occurred was not accessible to family, friends or persons other than patients and medical personnel. *See* Appellant's Brief 12, citing Judgment Entry 4. He observes that in our opinion in *Weisgarber,* we affirmed a trial court's determination that a similar encounter was not consensual, in part because the defendant in that case had been "approached * * * in a private room in the emergency department, which was likely not accessible to the public at large." Appellant's Brief 12; *see Weisgarber* at ¶ 20-21.

{¶ 14} The room in *Weisgarber* was described as an " 'individual emergency room,' " which measured "approximately 12 [feet] by 12 [feet] or 15 [feet] by 15 feet." *Weisgarber* at ¶ 5. Here, however, Penwell spoke with police officers in a corridor in the emergency department. Although the trial court erred by finding as a matter of fact that the corridor was "generally accessible to family and friends of patients and even [to] the public at large," we conclude that the corridor was an intrinsically less confining location than the private room described in our *Weisgarber* opinion. Judgment Entry 4; Transcript at 9:1-9:19.

{¶ 15} Furthermore, we noted in *Weisgarber* that the record included "no evidence that the officer introduced himself [to the defendant], [no evidence that the officer] asked [the defendant] if he [would be] willing to answer questions, [and no evidence that the officer] engaged in any [other] conversation [before] asking [the defendant] whether [he] had drugs or weapons" on his person. *Weisgarber* at ¶ 21. On that record, we "defer[red] to the trial court's implicit factual finding that," evaluated in light of "the location of the encounter," the officer's "use of language and [the officer's] demeanor" constituted "a display of authority * * * indicat[ing] to [the defendant] that * * * response[s] [to the

officer's questions were] required." *See id.* at ¶ 20-21.

{¶ 16} In the instant case, however, the record includes some evidence—albeit ambiguous evidence—that Officers Freeman and Sanders engaged in superficial conversation with Penwell before seeking his consent to a search of his person. Officer Freeman testified, during the hearing on the motion to suppress, that when she and Officer Sanders approached Penwell, "[they] spoke with him," and "[she] asked him what he had used."[3] *See* Transcript at 4:24-5:17. On cross-examination, Penwell's counsel asked Officer Freeman to recall "the very first thing [she] said" to Penwell after approaching him, but she answered that she "couldn't tell [counsel] verbatim" what she had said. *Id.* at 13:15-13:20. Although Officer Freeman's testimony was thus ambiguous, it suggested that she and Officer Sanders at least briefly conversed with Penwell before questioning him in earnest.

{¶ 17} Compared, then, to the encounter at issue in *Weisgarber*, Penwell's encounter with police officers occurred in a relatively less confined setting, and the officers' language and demeanor did not obviously constitute a display of authority. Of the factors we listed in *Cook*, 2d Dist. Montgomery No. 20427, 2004-Ohio-4793, the only factor that would unequivocally support a finding that Penwell's encounter was an investigatory detention was the presence of two police officers, rather than one officer, but the record comprises no evidence that either Officer Freeman or Officer Sanders brandished a weapon, touched Penwell, or used language or spoke in a tone of voice implying that Penwell was required to respond to their questions. *Cook* at ¶ 11.

---

[3] Officer Sanders did not testify during the hearing.

Penwell's placement in the corridor, for that matter, would not have allowed him to walk away easily from the encounter, yet regardless, the officers did not intentionally block his path to an exit. *See* Transcript at 10:10-11:17. We hold accordingly that Penwell's interaction with the officers was a consensual encounter, not an investigatory detention.

{¶ 18} In the second part of his argument, Penwell denies that he consented to the search of his person. Appellant's Brief 15-17. Specifically, he maintains that he did not voluntarily consent because he was subjected to an investigatory detention, "had recently suffered unconsciousness," and had been treated with Narcan, which "call[s] [his lucidity at the time] into question." *See id.* at 16.

{¶ 19} Consent to a search "is an exception to the warrant requirement that requires the State to 'show by "clear and positive" evidence that the consent was "freely and voluntarily" given.' " *State v. Ojezua*, 2d Dist. Montgomery No. 26787, 2016-Ohio-2659, ¶ 17, quoting *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). The standard of "clear and positive" evidence is essentially equivalent to the standard of "clear and convincing evidence." *See id.* at ¶ 18. Whether a person's consent to a search is truly voluntary must be determined in light of the circumstances. *Weisgarber*, 2017-Ohio-8764, 88 N.E.3d 1037, at ¶ 17-19; *Westover*, 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 13. Generally, this determination entails the consideration of six factors: "1) 'whether the defendant's custodial status was voluntary; 2) whether coercive police procedures were used; 3) the extent and level of the defendant's cooperation; 4) the defendant's awareness of his * * * right to refuse consent; 5) the defendant's education and intelligence; [and] 6) the defendant's belief that no incriminating evidence would be found.' " *State v. Black*, 2d Dist. Montgomery No. 23524, 2010-Ohio-2916, ¶ 35-41,

quoting *State v. Loyer*, 8th Dist. Cuyahoga No. 87995, 2007-Ohio-716, ¶ 9.

{¶ 20} We have held that Penwell's interaction with Officers Freeman and Sanders was a consensual encounter. Consequently, for purposes of determining whether Penwell consented voluntarily to a search, we find that he was not in custody when the officers requested his consent, and that the officers did not employ coercive police procedures to convince him to consent. Officer Freeman's testimony provided no indication that Penwell was anything less than cooperative during the encounter, notwithstanding his initial denial that he had consumed any illegal drugs. *See* Transcript at 13:21-14:1. Neither the State nor Penwell's counsel asked the officer whether she or Officer Sanders informed Penwell that he had the right to refuse to consent, and the record is silent on Penwell's level of education. The warrant for his arrest, however, indicated that Penwell was 27 years old on October 11, 2017.[4] In his own testimony at the hearing on his motion to suppress, Penwell had no apparent difficulty understanding questions, and he was able to answer clearly and appropriately. *See* Transcript 24:18-25:19. Because Penwell disclaimed any memory of speaking with Officers Freeman and Sanders at the hospital, the record is inconclusive on the question of whether he believed that the officers would not find anything incriminating on his person. *Id.* at 23:17-25:23.

{¶ 21} Taking the record as a whole, we find that consideration of the six factors listed in our opinion in *Black* favors the trial court's determination that Penwell voluntarily consented to the search of his person. *Compare with State v. Ivkovich*, 2018-Ohio-609, 106 N.E.3d 305, ¶ 2-3 and 21-27 (2d Dist). Regarding Penwell's lucidity, Officer

---

[4] The birthdate listed on the State's praecipe for a warrant for Penwell's arrest, on the other hand, indicates that Penwell was approximately 22 years and 11 months old on October 11, 2017.

Freeman testified that Penwell was "just sleepy and intoxicated," but recanted her use of the word "intoxicated" at once, adding that because "Narcan is only effective against an opiate," Penwell could not have been intoxicated as the result of the consumption of alcohol. *See* Transcript 5:17-5:21. In the remainder of her testimony, Officer Freeman described Penwell as seeming coherent; as having his eyes open when she first approached him; as being responsive to her questions; as "clear speaking and alert"; and seeming to understand her questions and her request for his consent to a search. *Id.* at 5:22-5:24, 13:12-13:14, 16:17-16:19, 17:22-18:6 and 22:23-22:25.

{¶ 22} Penwell testified that he could not remember being treated by medical personnel or speaking with Officers Freeman and Sanders. *Id.* at 24:14-26:6. By his account, he remembered only "[b]eing at the library" and then, "at some point," seeing his "grandparents * * * at the hospital." *Id.* Even if Penwell recalled nothing more than he indicated in his testimony, his inability to recall speaking with the officers would not necessarily have precluded the possibility that, when Officer Freeman asked for his consent, he was sufficiently lucid to understand the question. Regardless, the trial court did not find his testimony to be credible, and as the trier of fact, the trial court was in the best position to weigh the evidence and to evaluate Penwell's credibility. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. Given that we must accept the trial court's findings of fact for purposes of Penwell's appeal, we hold that the trial court did not err in determining that Penwell voluntarily consented to a search of his person.[5]

---

[5] We noted that the trial court erred by finding that the corridor in which Officers Freeman and Sanders encountered Penwell was open to the public at large, but with respect to that specific finding, the record included competent evidence directly contradicting the court's finding. The record includes no such evidence directly contradicting the trial court's finding that Penwell's testimony was not credible.

*Id.*

{¶ 23} We note, finally, that even if Penwell's encounter with Officers Freeman and Sanders were an investigatory detention, the officers had a reasonable, articulable suspicion of criminal activity. Reasonable suspicion means that a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [a limited] intrusion" on a person's "constitutionally protected interests." *See Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. The term "reasonable suspicion" refers to "something more than an inchoate and unparticularized * * * 'hunch,' but [to] something less than the level of suspicion for probable cause"; a demonstration of probable cause, by comparison, generally requires a likelihood "or substantial chance of criminal activity." *Village of Chagrin Falls v. Calabrese*, 8th Dist. Cuyahoga No. 101197, 2014-Ohio-5340, ¶ 14, citing *Terry* at 21. To determine whether a police officer had reasonable suspicion, "we evaluate the 'totality of the circumstances' " from the perspective of a hypothetical "reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991); *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14.

{¶ 24} Here, Officers Freeman and Sanders approached Penwell after being advised that he had been admitted to the emergency department at the Springfield Regional Medical Center for an opiate overdose, that he had received several doses of Narcan, and that he had responded favorably to such treatment. *See* Transcript 4:16-5:21 and 11:18-12:4. Officer Freeman testified further that Narcan is effective only for treating opiate overdoses, and her testimony implied that her interaction with Penwell was

hardly her first interaction with the victim of an overdose. *See id.* at 3:25-4:15, 12:13-13:8 and 14:2-14:25. Thus, Officer Freeman had specific, articulable facts that supported the rational inference that Penwell had overdosed on an opiate, because he otherwise would not have responded to treatment with Narcan.

{¶ 25} Moreover, this court and others in the state have acknowledged what has been called the "opioid crisis" or the "opioid epidemic." *See, e.g., State v. Miller*, 2019-Ohio-3294, 141 N.E.3d 604, ¶ 37 (2d Dist.); *Acuity v. Masters Pharmaceutical, Inc.*, 1st Dist. Hamilton No. C-190176, 2020-Ohio-3440, ¶ 2; *State v. Davis*, 8th Dist. Cuyahoga No. 105129, 2017-Ohio-8479, ¶ 16. Irrespective of the fact that Penwell theoretically could have taken a legitimately prescribed opiate and overdosed accidentally, the information at Officer Freeman's disposal, in the context of the widely publicized opioid crisis, supported more than a mere, inchoate hunch that Penwell's overdose might have been the result of his consumption of an illicitly obtained opiate. *See Terry* at 21; *Calabrese* at ¶ 14. Penwell's assignment of error is overruled.

### III. Conclusion

{¶ 26} We hold that the trial court did not err by overruling Penwell's motion to suppress evidence obtained as a result of his encounter with two police officers at the Springfield Regional Medical Center and the concomitant search of his person. The police officers' interaction with Penwell was a consensual encounter, and regardless of the fact that the search occurred while Penwell lay on a bed in a corridor in the hospital's emergency department, his consent to the search was voluntary under the circumstances. Penwell's conviction is therefore affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., dissents:

{¶ 27} The "opioid epidemic" does not suspend the Fourth Amendment.   I find our prior jurisprudence in *Weisgarber,* 2017-Ohio-8764, 88 N.E.3d 1037, controlling. The interior corridor of the hospital emergency room, not accessible to the public or Penwell's family, was every bit as non-public as the private room in *Weisgarber*.   It was not established to be any "intrinsically less confining" than a hospital room, as the majority suggests.   This was clearly a non-consensual encounter.

{¶ 28} Furthermore, a sleepy and intoxicated patient, such as Penwell, who had been administered multiple doses of Narcan, cannot be said to have voluntarily consented to a search under the totality of the circumstances.   I would reverse.

Copies sent to:

Ian Richardson
Charles M. Blue
Hon. Douglas M. Rastatter