[Cite as *State v. Weaver*, 2025-Ohio-2256.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-53 |
| Appellee | : | |
| | : | Trial Court Case No. 23-CR-808 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| WILLIE WEAVER | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 27, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

[[Applied Signature]]

CHRISTOPHER B. EPLEY, PRESIDING JUDGE

[[Applied Signature 2]]

MARY K. HUFFMAN, JUDGE

[[Applied Signature 3]]

ROBERT G. HANSEMAN, JUDGE

**OPINION**
CLARK C.A. No. 2024-CA-53

NICOLE K. DIETZ, Attorney for Appellant
CHRISTOPHER P. LANESE, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Defendant-Appellant, Willie Weaver, appeals from his conviction for having weapons under disability. In support of his appeal, Weaver contends the trial court erred in overruling his motion to suppress. Weaver also asserts the State failed to provide sufficient evidence to prove the elements of the crime.

{¶ 2} After reviewing the record, we find the trial court did not err in overruling Weaver's motion to suppress his statements and evidence of a firearm. The encounter was consensual. In addition, the firearm was in plain view of state agents who were conducting an administrative inspection of a bar where Weaver was engaged in providing security services. Even if a brief detention had occurred, the investigating agents had reasonable suspicion, based on specific, articulable facts, that criminal activity was afoot. Weaver's conviction for having weapons under disability was also supported by sufficient evidence of his prior conviction of a felony offense of violence. Accordingly, the judgment of the trial court is affirmed.

I. Facts and Course of Proceedings

{¶ 3} In November 2023, an indictment was filed charging Weaver with having weapons under disability in violation of R.C. 2923.13(A)(2). The indictment also included a

specification seeking forfeiture of an SCCY Industries Model CPX-2 handgun. After Weaver pled not guilty, the trial court released him on his own recognizance. In January 2024, Weaver filed a motion to suppress evidence of the gun and statements that he had made. After holding hearings, the court denied the suppression motion and set a trial date for August 13, 2024. The trial occurred as scheduled and, after hearing the evidence, the jury found Weaver guilty as charged. The court sentenced Weaver to 18 months in prison and ordered the gun forfeited to law enforcement. Weaver timely appealed.

## II. Denial of Motion to Suppress

{¶ 4} Weaver's first assignment of error states that:

> The Trial Court Erred by Overruling Appellant's Motion to Suppress the Firearm and Statements Made by Appellant.

{¶ 5} Under this assignment of error, Weaver admits that the facts surrounding his interaction with law enforcement officers from the Ohio Investigative Unit ("OIU") are not disputed. The officers came to the club at which Weaver was working as a security officer to conduct an administrative inspection, and they observed that he was armed but was not wearing photo identification indicating that he had passed the firearms qualification, as required. However, Weaver contends the warrantless search by the OIU officers did not qualify under any exception to the requirement that a warrant be obtained before a search is conducted. Consequently, Weaver argues the trial court incorrectly applied the law in refusing to suppress evidence (his gun and statements to the officers). In response, the State maintains that the search was authorized either by the plain view or consensual encounter exception to the warrant requirement.

{¶ 6} After hearing the evidence, the trial court found the warrantless search was

permissible based on two exceptions to the warrant requirement. First, the search was consensual; second, even if the search had moved to an investigatory stage, the plain view doctrine applied. Journal Entry Denying Defendant's Motion to Suppress and Setting Trial Date (June 5, 2024) ("Supp. Entry"), p. 2-3.

{¶ 7} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. . . . Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

{¶ 8} "The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures." *State v. Garrett*, 2018-Ohio-4530, ¶ 18 (2d Dist.), citing *Terry v. Ohio*, 392 U.S. 1 (1968). "A seizure for purposes of the Fourth Amendment occurs when law enforcement, through physical force or a display of authority, restrains a person's liberty of movement such that the person would believe they could not leave." *State v. Hale*, 2024-Ohio-4866, ¶ 14, citing *United States v. Mendenhall*, 446 U.S. 544, 553-554 (1980). However, "these guarantees are not implicated in every situation where the police have contact with an individual." *State v. Taylor*, 106 Ohio App.3d 741, 747 (2d Dist. 1995), citing *California v. Hodari D.*, 499 U.S. 621 (1991), and *State v. Retherford*, 93 Ohio App.3d 586 (2d Dist.1994).

{¶ 9} There are three types of police and citizen interaction. "The first is referred to as a 'consensual encounter,' in which there is no restraint on the person's liberty. There

need be no objective justification for such an encounter." *Retherford* at 594, citing *Florida v. Royer*, 460 U.S. 491 (1983). In this situation, "officers may approach someone in a public place, identify themselves, ask whether the individual is willing to answer questions, and use any voluntary responses they receive in a criminal prosecution without the Fourth Amendment being implicated." *Id.* at 595, citing *Royer* at 498. This is the first conclusion that the trial court made, i.e., that the interaction was consensual.

{¶ 10} " 'The request to examine one's identification does not make an encounter nonconsensual. Nor does the request to search a person's belongings. The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the next two Supreme Court categories.' " *State v. Hardin*, 2005-Ohio-130, ¶ 14 (2d Dist.), quoting *Taylor* at 747-748. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). *See also State v. Penwell*, 2021-Ohio-1216, ¶ 12 (2d Dist.).

{¶ 11} During the suppression hearing, the court heard testimony from Travis Kling and Travis Woodruff. For purposes of analysis, we have reviewed the suppression hearing transcripts and the exhibits, which included Kling's body cam video. The video began when Kling arrived at the club and ended when he left the scene.

{¶ 12} Kling was a police officer employed by the OIU, which is part of the Ohio Department of Public Safety ("Safety Dept."). On August 25-26, 2024, the Safety Dept. initiated and completed an administrative inspection of a premises called "Club Hollywood" in Springfield, Ohio. Kling testified that the inspection was done pursuant to provisions of the Ohio Administrative Code that authorize the Safety Dept. to determine compliance with provisions of the Liquor Control Act. Such inspections are allowed as long as a business is open or operating or appears to be open or operating. Transcript of Proceedings ("Tr. 1"), 9, 11-12, and 13; State's Ex. 6 (Kling's body-cam video).[1]

{¶ 13} OIU brought about five or six officers to the club and arrived at around 11:15 p.m. When Kling arrived, he first encountered Weaver on the steps in front of the club, which was open for business. Kling saw lights on inside the club's window, and the door was open. Kling also saw dance lights and patrons outside, and people were cooking food in a food truck. At the time, Weaver was wearing security garb, including a vest marked "Security." When Kling first approached Weaver, he saw the butt of a gun in a holster on Weaver's person. Weaver also wore an attachment carrier on which a stun gun and multiple other items hung, including a body camera and cuffs. Tr. 1 at 20, 22, 27-28, and 29-31; State's Ex. 1; and State's Ex. 6. The OIU officers left the scene around 12:16 p.m. on August 26, i.e., about an hour after they had arrived. *Id.*

{¶ 14} Kling did not announce to Weaver why he was there but asked if Weaver was a licensed private security guard. Generally, licensed security guards have photo identification stating they have passed the firearms qualification, and they are required to

---

[1] The suppression hearing transcript consists of two volumes that are numbered sequentially and will be referenced as Tr. 1. As the jury trial transcript is contained in a separate volume that is not numbered sequential to the others, it will be referenced as "Tr. 2."

carry that on their person. In response to the question, Weaver said he was licensed, but he did not have any identification or a driver's license on his person. When Kling told Weaver that he was required to carry a license in that capacity, Weaver stated that he worked for someone who did. The initial encounter between Kling and Weaver was quite brief (less than a minute) because the bar owner, Travis Woodruff, asked if the officers had a search warrant. Consequently, Kling thought it prudent to explain to Woodruff that a search warrant was neither needed nor required. Kling then went into the bar to conduct his investigation. Kling did not take Weaver's weapon, and Weaver was free to walk around the bar. Tr. 1 at 12-13, 20-21, 27, and 29-30; State's Ex. 6, 01:51 to 02:10 (referring to time that had elapsed on the video, such as one minute and 51 seconds, rather than the actual date and time reflected at the top of the video screen).

{¶ 15} This initial encounter fell within the category of a consensual encounter with no restraint on Weaver's liberty and no need for objective justification. Kling did testify, however, that when he went into the bar, he had a reasonable suspicion that Weaver was operating as a security guard in possession of a firearm without being licensed. Tr. 1 at 43. While this is unneeded for a consensual encounter, we agree that the circumstances gave rise to a reasonable suspicion of criminal activity.

{¶ 16} R.C. Chap. 4749 governs licensing of private investigators and security services and, per R.C. 4749.02, is administered by the director of public safety. Under R.C. 4749.01, firearm license holders are separated into three classes – A, B, or C – depending on whether they are engaging in the business of private investigation, security services, or both. As relevant here, R.C. 4749.01(G) defines a "Class C license" as "a license issued under section 4749.03 of the Revised Code that qualifies the person issued the license to engage only in the business of security services." Before obtaining a license, applicants

must provide various information and meet certain requirements specified in R.C. 4749.03(A), (B), and (C). These include passing an examination, providing references, submitting a set of fingerprints to the superintendent of the bureau of criminal investigation ("BCI"), undergoing a criminal records check, and so forth.

{¶ 17} Under R.C. 4749.03(C)(1), applicants who intend to carry a firearm as defined in section 2923.11 of the Revised Code in the course of business or employment must notify the BCI superintendent. A "firearm" is defined in R.C. 2923.11(B)(1) as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." *Id.*

{¶ 18} In this situation, after being notified of an applicant's intent to carry a firearm, the BCI superintendent must ask the FBI for any information about the applicant and review it. The superintendent then submits all investigation reports to the public safety director. R.C. 4749.03(C)(2). If the application is approved, the director issues an A, B, or C license and provides the applicant with an identification card stating "the licensee's name, the classification of the license, the location of the licensee's principal place of business in this state, and the expiration date of the license. . . ." R.C. 4749.03(D).

{¶ 19} Furthermore, R.C. 4749.10(A) prohibits Class A, B, or C licensees and registered employees of a class A, B, or C licensee from carrying firearms in the course of the business of security services unless five listed requirements have been met. Among these requirements is that "[t]he licensee or employee receives a notation on the licensee's or employee's identification card that the licensee or employee is a firearm-bearer and carries the identification card whenever the licensee or employee carries a firearm in the course of engaging in the business of private investigation, the business of security services,

or both businesses." R.C. 4749.10(A)(3). *See also* R.C. 4749.06(A)-(D) (noting that even if individuals are providing security services for an entity that has a Class A, B, or C license, if these individuals intend to carry firearms in the course of business or employment, they must complete a firearms training program and must comply with the requirements of R.C. 4749.10). As noted, that includes carrying an identification card.

{¶ 20} Finally, R.C. 4749.13(A) prohibits people who are not licensed under R.C. Chap. 4749 from engaging in the business of security services; subdivision (D) also prohibits unlicensed people from holding themselves out as Class A, B, or C licensees. The penalty for violating these sections, respectively, is: (1) being charged with a first-degree misdemeanor crime; or (2) being assessed a fine between $100 and $1,000 or a year in prison, or both. *See* R.C. 4749.99(A) and (B). Thus, even though Weaver was not ultimately charged with a crime under this statute, when Kling saw that Weaver was armed with a gun, was operating as a security guard, and was unable to produce an identification card, Kling had reasonable suspicion of criminal activity.

{¶ 21} As noted, before entering the bar, Kling already had a reasonable suspicion of criminal activity. In total, OIU was on the scene for only about an hour. Kling's liquor inspection of the bar records and liquor stock lasted a bit more than 11 minutes; Weaver was not involved in that situation. State's Ex. 6 at 02:10 to 13:54. At that point, Kling asked another officer if the security guard had been identified yet. Kling then asked Weaver if he had any felonies, and Weaver said no. *Id.* at 13:59. In fact, Weaver stated several times during the encounter that he did not have any felony convictions. Tr. 1 at 23.

{¶ 22} At the beginning of Kling's second conversation with Weaver, Kling explained that even if Weaver were employed by someone who had a firearm license, Weaver was required to have his own license. Based on this discussion and Weaver's reaction on the

video, he appeared to acknowledge that he did not have a firearm license. *See* State's Ex. 6 at 14:01-1440. Kling then told Weaver he needed to check the gun to make sure it was not stolen. Kling took the gun, unloaded it, and found the serial number. *Id.*

{¶ 23} This was when the plain view exception became relevant. According to Weaver, this was the only exception that could arguably have applied in the case before us. Appellant's Brief, p. 9. In this regard, Weaver argues that carrying a weapon is not illegal in Ohio, and the gun was not stolen, as Kling stated. *Id.* at p. 10.

{¶ 24} "One exception to the warrant requirement is the 'plain view' doctrine, first expressly established in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. In essence, the plain view doctrine allows police officers, under particular circumstances, to seize an 'article of incriminating character' which is not described in their search warrant." *State v. Halczyszak*, 25 Ohio St.3d 301, 303 (1986). Under this doctrine, "an officer may seize an object in plain view without a warrant if (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be viewed, (2) the object's incriminating nature is immediately apparent, and (3) the officer has a right to access the object where it is located." *State v. Burroughs*, 2022-Ohio-2146, ¶ 15, citing *Horton v. California*, 496 U.S. 128, 136-137 (1990).

{¶ 25} These criteria were met here. Kling had the right to be at the bar, and he immediately saw the gun in a holster on Weaver's hip. Concerning "the second requirement of the plain-view doctrine, the police need to have probable cause, with some narrow exceptions, to immediately believe upon discovery of the article in plain view that it is obviously incriminating evidence or contraband." *State v. Willoughby*, 81 Ohio App.3d 562, 568 (6th Dist. 1992), citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). Notably, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the

officer would 'warrant a man of reasonable caution in the belief' . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983), quoting *Carroll v. United States*, 267 U.S. 132 (1925). "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.*, quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

{¶ 26} When Kling took the gun, he reasonably believed Weaver was engaged in security services without being licensed, and the gun, therefore, was involved in criminal activity. That the gun was eventually found not to be stolen was irrelevant. The focus is on the circumstances when the gun was seized. Confirming whether the gun was stolen took several minutes due to difficulty reading the serial number and because the gun initially turned up as having been stolen. *Id.* at 14:40 to 21:16. Kling later discovered it was not stolen. Apparently, manufacturer serial numbers can overlap, and this weapon's make differed from one with the same serial number that had been stolen. Tr.1 at 15-16. Kling also had the authority to access the gun where it was located, as he had arrest authority in Clark County. *Id.* at 46. Accordingly, the trial court correctly applied the plain view doctrine.

{¶ 27} The trial court found the entire proceeding consensual based on various factors like the lack of any show of force and that the officers used appropriate language and tone of voice. Supp. Entry at p. 2-3. We agree. However, even if this were otherwise, another recognized exception "to the warrant requirement is an investigative detention, commonly referred to as the *Terry* stop. Under *Terry . . .* a police officer may detain an individual without probable cause when the officer has reasonable suspicion, based on specific, articulable facts, that criminal activity is afoot." *State v. Bursey*, 2021-Ohio-2857, ¶ 19 (2d Dist.), quoting *Terry*, 392 U.S. at 21.

**{¶ 28}** "Reasonable suspicion entails some minimal level of objective justification for making a stop – that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556-557 (2d Dist. 1990), quoting *Terry* at 27. The test for assessing this is objective and considers the totality of the circumstances, "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991), citing *United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976), and *State v. Freeman*, 64 Ohio St.2d 291, 295 (1980).

**{¶ 29}** While checking the gun's serial number, Kling received information from Agent Love, who had run Weaver's name and date of birth. Once Weaver was identified, it was found that he had "suspect cautions" associated with his LEADS file. The caution was basically that officers should be cautious in interacting with Weaver. This prompted further investigation. Love had shown Kling information on OLEG (a law enforcement database), and Kling was able to see that Weaver had an FBI number and a BCI number. Tr. 1 at 23, 37-39, and 42; State's Ex. 6 at 22:02-22:06.

**{¶ 30}** To investigate this, Kling spent time on the phone with a police post, which had to create an incident report in order to run a records check. After being on hold for some time, Kling learned that all charges in Ohio had been dismissed, but Weaver had a violent felony tag from New York. *Id.* at 24:17 to 24:27 and 34:35-34:40.

**{¶ 31}** After ending the first phone call at around 39:40, Kling told Weaver about the report of a felony conviction for robbery in New York, which was a felony of violence. Because Weaver continued to deny any prior convictions, Kling then called the Intelligence Center in Columbus. After again being on hold for some time, Kling was told that Weaver had felony offenses from Pennsylvania and New York, including a weapons conviction.

However, the Intelligence Center was unable to provide a booking photo for comparison at that point. *See* State's Ex. 6 at 39:45 to 53:44. When Weaver continued to deny any involvement, the OIU officers decided to take Weaver's photo rather than arrest him. They also said they would retain the gun and continue to attempt to verify the information. In addition, they stated the gun would be returned to Weaver if his story checked out. After taking the photo, the officers left around 12:16 a.m.

{¶ 32} Based on the video and the totality of the circumstances, the trial court could have reasonably concluded that the OIU officers had a reasonable, articulable suspicion that Weaver had committed a crime and did not unreasonably detain him. Any delay was unavoidable due to the difficulty in obtaining information. In fact, when the officers left, they were still attempting to verify whether Weaver had the alleged felony convictions of violence. Because of this, they simply took Weaver's photo and did not arrest him. The video also indicated that the police were very cordial, did not coerce Weaver in any way, and did not make a show of force. In fact, during parts of the video, Weaver was joking and chatting with the police.

{¶ 33} Based on the preceding discussion, the trial court did not err in overruling the motion to suppress. Accordingly, the first assignment of error is overruled.

### III. Denial of Motion for Acquittal

{¶ 34} Weaver's second assignment of error states that:

The Trial Court Erred by Overruling Appellant's Motion for Acquittal (Crim.R. 29) Where the State Failed to Present Sufficient Evidence to Prove Each Element of Weapons Under Disability.

{¶ 35} Under this assignment of error, Weaver contends his motion for acquittal

should have been granted because the State failed to prove a prior conviction that prevented him from carrying a firearm in Ohio. Specifically, Weaver argues that State's Ex. 3-B was not a proper judgment of conviction for this purpose, as it did not contain a judge's signature and there was no indication it had been entered into a journal. In response, the State notes other methods exist for establishing a prior conviction.

{¶ 36} "When considering a Crim.R. 29 motion for acquittal, the trial court must construe the evidence in a light most favorable to the state and determine whether reasonable minds could reach different conclusions on whether the evidence proves each element of the offense charged beyond a reasonable doubt." *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000), citing *State v. Bridgeman*, 55 Ohio St.2d 261 (1978). "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). Because sufficiency involves a question of law, courts apply de novo review. *Thompkins* at 386.

{¶ 37} "The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Hawn* at 471, quoting *Jenks*.

{¶ 38} The offense in question, set forth in R.C. 2923.13(A)(2), provides that, "Unless relieved from disability under operation of law or legal process, no person shall knowingly

acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person is under indictment for or has been convicted of any felony offense of violence . . . ." As relevant here, an offense of violence as defined in R.C. 2901.01(A)(9) "means any of the following: (a) A violation of section . . . 2911.01 [aggravated robbery] or . . . 2911.02 [robbery]," or "(b) A violation of an existing or former . . . law of this or any other state or the United States, substantially equivalent to any section, division, or offense listed in division (A)(9)(a) of this section." Weaver has not claimed either at trial or on appeal that his alleged prior robbery conviction in New York was not an offense of violence.

{¶ 39} "R.C. 2945.75(B)(1) 'governs the introduction of prior convictions as an element of an offense.' " (Emphasis deleted.) *State v. Johnson*, 2022-Ohio-4629, ¶ 60 (2d Dist.), quoting *State v. Werfel*, 2003-Ohio-6958, ¶ 40 (11th Dist.). This section of the statute says that: "Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction."

{¶ 40} To support his argument that the State presented insufficient evidence of a prior conviction, Weaver relies on *State v. Gwen*, 2012-Ohio-5046. *See* Appellant's Brief at p. 11. In *Gwen*, the Supreme Court of Ohio addressed two questions: (1) "whether a judgment of conviction is the exclusive method of proving a prior conviction under R.C. 2945.75(B)(1)"; and (2) "whether the judgment entry must comply with Crim.R. 32(C) when the state elects to use it to prove a prior conviction." *Gwen* at ¶ 9. Concerning the first question, the court held that "R.C. 2945.75(B)(1) sets forth one way to provide 'sufficient' proof of a prior conviction, but does not provide the *only* method to prove it." (Emphasis in original). *Id.* at ¶ 14.

**{¶ 41}** Regarding the second question, the supreme court stated:

We do not agree with the Ninth District's acceptance of the argument that the word "convicted" refers only to a determination of guilt and not a judgment of conviction. In *State v. Henderson*, 58 Ohio St.2d at 178, 389 N.E.2d 494, this court held that a sentence must have been imposed before an offender may be regarded as having a prior conviction[.] " 'Conviction' includes both the guilt determination and the penalty imposition." *State v. Poindexter*, 36 Ohio St.3d 1, 5, 520 N.E.2d 568 (1988). A judgment of conviction does not exist without a sentence. *State v. Robinson*, 187 Ohio App.3d 253, 2010-Ohio-543, 931 N.E.2d 1110, ¶ 27 (1st Dist.). And we have determined that a judgment entry of conviction must follow Crim.R. 32(C) to be appealable. *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163. A final, appealable judgment entry of conviction must contain (1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk. *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, paragraph one of the syllabus. When the state chooses to provide a judgment of conviction pursuant to R.C. 2945.75(B)(1), the entry must comply with Crim.R. 32(C). This will be "sufficient" proof of the conviction.

*Gwen*, 2012-Ohio-5046, at ¶ 20.

**{¶ 42}** Weaver argues that State's Ex. 3-B, admitted at trial, was insufficient proof because it lacked a judge's signature. According to the State, the evidence here falls within *Gwen's* statement that R.C. 2945.75(B)(1) provides only one means to prove prior convictions, and other methods exist. State's Brief at p. 8. The State then relies on three

cases that *Gwen* approved as examples of other methods of proof. *Id.*

{¶ 43} In this regard, the State is correct. In *Gwen*, the court stressed: "We agree with those appellate courts that have held that other methods may exist to prove the element beyond a reasonable doubt. *See, e.g.*, *State v. Frambach*, 81 Ohio App.3d 834, 843, 612 N.E.2d 424 (1992); *State v. Chaney*, 128 Ohio App.3d 100, 105-106, 713 N.E.2d 1118 (1998); *In re R.B.*, 6th Dist. Nos. H-10-018 and H-10-019, 2011-Ohio-5042, ¶ 10." *Gwen* at ¶ 22. Applying those cases, the State lists trial testimony and various documents it submitted to establish the prior conviction. *See* State's Brief at p. 8-9, referencing State's Exs. 3-A and 3-B and Kling's testimony.

{¶ 44} Based on our review, State's Ex. 3-B is not a "judgment of conviction" and, therefore, the Crim.R. 32(C) elements did not need to be established. For purposes of analysis, we have reviewed the cases citing *Gwen* since it was decided in 2012 and found that none deal with the specific situation involved here. Most of the cases involve prior Ohio convictions, and in these situations, Crim.R. 32(C) would clearly apply. One case that involved a judgment entry from another state (New Jersey) had a stamp on the entry labeled "True Copy." *State v. Rogers*, 2015-Ohio-2093, ¶ 35-36 (7th Dist.). The court of appeals remarked that the issue there was not whether the entry complied with Crim.R. 32(C) but whether it was a certified copy per R.C. 2945.75(B)(1). The court's reasoning was that Ohio courts use a different certified copy stamp than the one on the New Jersey entry.[2] The court decided it did not need to answer this question, because the State had failed to furnish

---

[2] In our view, this is irrelevant. R.C. 2945.75(B)(1) does not specify a particular format for certified copies. Furthermore, Evid.R.902(1) and (4) allow domestic public documents under seal and certified copies of public records to be admitted without extrinsic evidence of admissibility. In fact, the trial court here found the certified documents admissible. *E.g.*, Tr. 2, 156. We agree with the trial court that State's Exs. 3-A and 3-B were admissible.

evidence that the defendant in New Jersey (who had a different name) was the same person as the defendant who was before the court in Ohio. *Id.* at ¶ 38-43.

{¶ 45} Here, State's Ex. 3-B was a "Certificate of Disposition" from the Kings Supreme Criminal Court in Brooklyn, New York. The document was embossed with the court's seal and signed by Nancy Sunshine, the clerk for the court. The Certificate contained the caption "The People of the State of New York vs. Willie Weaver" and a "Legacy Docket Number" of SCI-05053 and an NYSID number of 07213062Z. *Id.* at p. 1.

{¶ 46} Beneath that information, the clerk stated: "THIS IS TO CERTIFY that the undersigned has examined the files of the Kings Supreme Criminal Court concerning the above entitled matter and finds the following." *Id.* The clerk then listed the following information: "Number of Counts" – "1"; "Incident Date" – "04/20/1995"; "Sentence Charge" – "PL 160.05"; "Charge Description" – "Robbery-3rd"; "Charge Weight" – "DF"; "Conviction Type" – "Pled Guilty"; "Conviction/Sentence Date" – "Conv: 05/08/1995", "Sent: 05/17/1995"; and "Sentence Highlight" – "• Imprisonment (1years - 3 years)", "• Surcharge (MS ($5.00) - due 05/17/1995 (Other Agency to Collect)." *Id.* The clerk further found that a balance remained due and owing for the fines, fees, and surcharges imposed at the time of sentencing. Finally, the clerk included a "Charge Weight Key" indicating that "DF" was a Class Felony. *Id.*

{¶ 47} The Certificate further stated: "CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL." *Id.* The document was embossed with a seal. In addition, the Certificate said: "Pursuant to Judiciary Law § 212.2(z), a certificate of disposition for the public contains only records of convictions, if any, and information about pending cases. . . . Conviction charges may not be the same as arrest charges." *Id.*

**{¶ 48}** N.Y. Judiciary Law 212 deals with functions of the chief administrator of the New York court system. Under N.Y. Judiciary Law 212.2, "The chief administrator shall . . . (z) take such actions and adopt such measures as may be necessary to ensure that a certificate of disposition or a written or electronic report of a criminal history search conducted for the public by the office of court administration contains only records of convictions, if any, and information about pending cases." In New York, these documents are referred to both as "certificates of disposition" and "certificates of conviction." *E.g., People v. Parsons,* 84 Misc.3d 637, 639 (Sup. Ct. Bronx Cty. 2024) (disposition); *People v. Melvin*, 279 A.D.2d 481 (N.Y.App. 2001) (conviction). New York courts use these certificates to establish prior convictions. *Id.* Again, they are not judgment entries.

**{¶ 49}** Furthermore, New York has a specific rule of evidence providing for the effect of such certificates. Under N.Y. Crim. P. 60.60.1, "A certificate issued by a criminal court, or the clerk thereof, certifying that a judgment of conviction against a designated defendant has been entered in such court, constitutes presumptive evidence of the facts stated in such certificate." *See also People v. Clyde*, 90 A.D.3d 1594, 1596 (N.Y.App. 2011) (noting presumptive effect); *People v. Sykes*, 167 Misc.2d 588, 590, 638 N.Y.S.2d 1010 (Sup. Ct. Monroe Cty. 1995) (same). Like Ohio, New York requires some connecting evidence of identity to satisfy the State's burden of proving the prior conviction beyond a reasonable doubt. *See People v. Taylor*, 827 N.Y.S.2d 584, 585-586 (Sup. Ct. Monroe Cty. 2006).

**{¶ 50}** Accordingly, because the State did not submit judgment entries here, the documents did not have to satisfy the requirement of having a judge's signature. As noted, a certified judgment entry is not the only means of establishing a prior conviction and, in *Gwen*, the court approved of other methods in three cases it cited. *Gwen*, 2012-Ohio-5046, at ¶ 22. Of the cited cases, the decision of the Ninth District Court of Appeals is most on

point. In that case, a certified copy of the judgment did not comply with Crim.R. 32(C). However, the court found that the "uncontested avowal" of an agent of the Department of Agriculture "to the effect that [the defendant] had suffered 'a prior theft conviction' was sufficient to allow the jurors to conclude beyond all reasonable doubt that this element of the offense had been established." *Frambach*, 81 Ohio App.3d at 843.

{¶ 51} In the case before us, the State submitted both certified evidence and testimony about Weaver's prior conviction. State's Ex. 3-A contained documents with the same heading and case number as Ex. 3-B and certifications by the same clerk of courts, who stated that she had compared the annexed documents with the original information in the court files, and they were true transcripts. Ex. 3-A was also embossed with the court's seal.

{¶ 52} These documents included an April 26, 1995 criminal complaint, which alleged that Willie Weaver had forcibly stolen property and had displayed "what appears to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm." *Id.* at p. 4. Although the initial complaint had charged first and second-degree robbery, the State then filed an information charging Weaver with third-degree robbery, which was a lesser charge. *Compare* N.Y. Penal Law 160.15, 160.10, 160.05, and 55.05 (unchanged in relevant part since the May 1995 conviction). Weaver waived the right to an indictment and agreed to be prosecuted by the information document the prosecution had filed for the third-degree robbery charge. This charge listed the same date, time, and place for the crime as was listed for the offenses charged in the complaint. In addition, Weaver waived the right to appeal any plea and sentence. The court accepted Weaver's waiver of the right to appeal, and this entry was signed by the judge. State's Ex. 3-A at p. 4.

{¶ 53} In addition to the documentary evidence, Agent Kling testified at Weaver's trial.

After arriving at the Hollywood Club around 11:00 p.m., Kling observed Weaver, who was wearing a black balaclava or ski mask, a vest that said "Security," and a badge on a neck chain that said "private security." Weaver also had a body camera, handcuffs, a 110 taser of some kind, and an outside waistband holster with a light blue handgun that was at his hip and plainly visible. Tr. 2 at 107-110 and 139. Their initial encounter occurred as related above, with Weaver claiming he was licensed but unable to produce a license or identification to that effect or a driver's license. *Id.* at 113-114 and 140.

{¶ 54} During the second encounter and while Kling was on the phone with dispatch confirming that Weaver's weapon was not stolen, Kling also worked to identify Weaver. Kling identified Weaver through a law enforcement database called OLEG, which officers can pull up on their phones. OLEG provides a driver's license image and allows confirmation that individuals are who they say they are. OLEG generated an "approach with caution" warning, which indicated Weaver had been arrested for possible past acts of violence. That caused Kling to start digging deeper. The OLEG form provided Kling with the following information: Weaver's social security number, his BCI number for arrests in Ohio, his date of birth, and his FBI number, which indicated arrests in multiple states. *Id.* at 115-116 and 158-159.

{¶ 55} Kling stated that he had access to OLEG, which combined information from multiple sources, including the bureau of motor vehicles, driving records, computerized criminal histories, court records, traffic tickets, license suspensions, misdemeanor arrests, and things of that nature. Kling was able to search OLEG by inputting things like names, addresses, birthdates, and social security numbers. *Id.* at 147-148. Kling further said that on the night of the incident, he had had multiple communications with dispatch, beginning with his dispatch center in Athens through the Ohio State Highway Patrol and ending with the Springfield Dispatch Center for the Ohio State Highway Patrol. He also talked to the

Intelligence Center for the Ohio State Highway Patrol. Kling was able to confirm Weaver's identity through driver's license images that corresponded with tattoos that Weaver had displayed. *Id.* at 122-123.

{¶ 56} After pulling up Weaver's driver's license on OLEG, Kling was able to select a social security number hyperlink, which then pulled up additional files. The case in State's Ex. 3-B had what is called a CCH (computerized criminal history), which revealed any time that an individual had been arrested, booked into jail, or convicted of a criminal offense. Kling's access was limited to Ohio, so he then called the Intelligence Center, which had trained analysts and full access to LEADS. Kling provided the center with the CCH numbers. Tr. 2 at 145, 149 and 159. From his communications that night, Kling discovered that there were additional law enforcement records for an individual who had information that seemed to match Weaver's across multiple states, and there was an indication of a prior conviction that would have disqualified Weaver from carrying a firearm. *Id.* at 124, 126, and 171.

{¶ 57} The birth date for Weaver on OLEG (July 10, 1976) matched the driver's license provided for Weaver, and the birth date and name also matched the ones in State's Ex. 3-B. The social security number that Kling saw in OLEG also matched the computerized criminal history that was provided for Weaver. *Id.* at 133 and 160-161. During his testimony, Kling additionally identified the certified records in State's Exs. 3-A and 3-B. The trial court found them to be self-authenticated documents and admitted them into evidence. *Id.* at 130-132, 156, and 178-178.

{¶ 58} Kling's testimony was not refuted in any way and, viewing the evidence most favorably to the prosecution, " 'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt' " based on this evidence. *Hawn*, 138 Ohio App.3d at 471. Accordingly, the second assignment of error is overruled.

## IV. Conclusion

{¶ 59} Both of Weaver's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


EPLEY, P.J. and HUFFMAN, J., concur.